GEORGE BEASTON, GARNISHEE OF THE ELKTON BANK OF MARY-
LAND v. THE FARMERS' BANK OF DELAWARE.

Priority of the United States. From the language employed in the fifth section of
the act of congress of March 3, 1797, giving a priority to debts due to the United
States, and the construction given to it by the Supreme Court; these rules are
clearly established: First, That no lien is created by the statute. Second, The
priority established can never attach while the debtor continues the owner, and in
the possession of the property, although he may be unable to pay all his debts.
Thirdly, No evidence can be received of the insolvency of the debtor, until he has
been divested of his property in one of the modes stated in the section. Fourthly,
Whenever the debtor is thus divested of his property, the person who becomes in-
vested with the title, is thereby made a trustee for the United States, and is bound
to pay the debt first, out of the proceeds of the debtor's property.
All debtors to the United States, whatever their character, and by whatever mode
bound, may be fairly included within the language used in the fifth section of the
act of congress. And it is manifest that congress intended to give priority of
payment to the United States over all other creditors, in the cases stated therein.
It therefore lies upon those who claim exemption from the operation of the statute,
to show that they are not within its provisions.
Corporations are to be deemed and considered *persons* within the provisions of the
fifth section of the act of congress of 1797; and the priority of the United States
exists as to debts due by them to the United States.
An attachment at the suit of the Farmers' Bank of Delaware was issued against the
effects of the Elkton Bank, on the 24th of September, 1830, and under it were at-
tached the funds of the Elkton Bank in the hands of one of its debtors. On the 8th
day of July, 1831, an attachment was issed at the suit of the United States, the Uni-
ted States being creditors of the Elkton Bank, and it was laid on the same funds
which had been previously attached at the suit of the Farmers' Bank of Delaware.
The money thus attached by the Farmers' Bank of Delaware, in the hands of a
debtor to the Elkton Bank, by legal process, before the issuing of the attachment
in behalf of the United States, was bound for the debt for which it was first legal-
ly attached, by a writ, which is in the nature of an execution; and the right of a
private creditor thus acquired, could not be defeated by the process subsequently
issued at the suit of the United States. If the district court of the United States
has a right to appoint receivers of the property of an insolvent bank which is in-
debted to the United States, for the purpose of having the property of the bank
collected and paid over to satisfy the debt due to the United States by the bank;
this would not be a transfer and possession of the property of the bank, within the
meaning of the act of congress; and the right of the United States to a priority of
payment, would not have attached to the funds of the bank.
The legislature of Maryland passed an act authorizing the stockholders of the Elk-
ton Bank to elect trustees, who were to take possession of the funds and property
of the bank, for the purposes of discharging the debts of the bank, and distributing
the residue of the funds, which might be collected by them, among the stock-
holders. This, had the law been carried into effect, was not such an assignment

[Beaston v. The Farmers' Bank of Delaware.]

of all the property of the bank as would entitle the United States to a priority of payment out of the funds of the bank.

No one can be divested of his property, by any mode of conveyance, statutory or otherwise, unless, at the same time and by the same conveyance, the grantee becomes invested with the title. The moment the transfer of property takes place, the person taking it, whether by voluntary assignment, or by operation of law, becomes, under the statute, bound to the United States for the faithful performance of the trust.

The cases of The United States v. The State Bank of North Carolina, 6 Peters, 29; The United States v. Amedy, 11 Wheat. 392; 6 Cond. Rep. 362; The United States v. Fisher, 2 Cranch, 358; 1 Cond. Rep. 421; The United States v. Hooe, 3 Cranch, 73; 2 Cond. Rep. 458; Price v. Bartlett, 8 Cranch, 431; Conrad v. The Atlantic Insurance Company, 1 Peters, 439; Conard v. Nicholl, 4 Peters, 308; Brent v. The Bank of Washington, 10 Peters, 596; Hunter v. The United States, 5 Peters, 173: cited.

ERROR to the court of appeals of the eastern shore of Maryland.

This suit was commenced in the Cecil county court, of the state of Maryland, in September, 1830, by an attachment issued at the instance of the Farmers' Bank of Delaware against the Elkton Bank of Maryland. To this writ the sheriff in October, 1830, returned that he had goods and chattels, rights and credits of the defendants, the Elkton Bank of Maryland, in the hands of George Beaston, to the amount of five hundred dollars, to the use of the plaintiffs in the attachment.

In April, 1834, the counsel for the plaintiffs, and for Mr. George Beaston, agreed on the following statement of facts:

It is agreed, that in 1828, the United States instituted suit against the Elkton Bank, in the circuit court of the United States; at the December session, 1829, a verdict and judgment were rendered in said suit, in favour of the United States, for twenty-one thousand two hundred dollars; on which judgment, a fi. fa. was issued to April term, 1830, and returned nulla bona: but it is admitted that, at that time, the said president and directors of the Elkton Bank had a large landed estate, which has since been sold and applied to satisfy, in part, the said judgment; which landed estate, together with all other effects or property belonging to the bank, would not enable the bank to pay its debts: and that the said property and effects are insufficient to pay the said debt due to the United States; and it is admitted, that the bank was then unable to pay its debts. An appeal to the Supreme Court of the United States was prosecuted, but no appeal bond given; and the judgment was affirmed in the Supreme Court,

at the January term, 1832. At the April term, 1830, of the circuit court, a bill in equity was filed against the said bank at the suit of the United States; and Nathaniel Williams and John Glenn were appointed, by an order of court, receivers, with authority to take possession of the property of the said bank, to dispose of the same, and to collect all debts due to it.

The proceedings by the United States against the Elkton Bank, and the acts of the receivers, Mr. Williams and Mr. Glenn, were made a part of the agreement as to the facts of the case.

At December session, 1829, application was made to the legislature of Maryland, by the several persons who were the acting presidents, and the acting directors of the said bank, for the act which was passed at that session, ch. 170; which, with all other acts relating to said bank, are to be considered as part of this statement.

The act of the legislature of Maryland, authorized the appointment of trustees by the stockholders of the Elkton Bank, on certain notice of the meeting of the stockholders being given; who were to take possession of the whole of the property of the Elkton Bank, and to proceed to the adjustment of its concerns. A meeting of the stockholders was convened on the 17th day of May, 1830, which was the third Monday of said month, but without the publication of the notice mentioned and required in the act incorporating the bank and its supplements; and at the said meeting, a majority of the stockholders appointed two trustees, in conformity to the provisions of said act, who declined accepting: and no trustees have ever been since appointed, nor has there since been an annual, or other meeting of the stockholders, or an election of directors; nor have there been any banking operations carried on by any persons professing to be the corporation of the Elkton Bank, since March, 1829. At September term, 1828, the Elkton Bank obtained a judgment against George Beaston, for the sum which is attached in this suit; which, at the time of the issuing and service of this attachment, had not been paid by Beaston. At April term, 1830, the Farmers' Bank of Delaware obtained, in Cecil county court, a judgment against the president and directors of the Elkton Bank, for five thousand dollars, with interest from 9th of December, 1825, till paid, and costs; and before the appointment and bonding of the receivers as aforesaid, and on the 24th of September, 1830, upon that judgment, issued this attachment; and attached in the hands of said Beaston, the sum of five hundred dollars: and after this attachment was issued and served, and after

the affirmation of the judgment of the circuit court by the Supreme Court, an attachment was issued by the United States, and the other proceedings had, as appeared by the records of the circuit and Supreme Courts of the United States, which were made part of the case. Beaston has actually paid, and satisfied the United States, the amount for which judgment of condemnation was rendered against him in the circuit court. It is admitted that, up to the time of the decision in the Supreme Court, the said receivers never had collected or received, or by any process of law attempted to collect or receive the said debt attached in this case. The question for the opinion of the court is, whether the plaintiff can sustain the present attachment?

By the record of the proceedings in the circuit court of the United States for the district of Maryland, it appeared, that upon the judgment obtained in December, 1829, against the Elkton Bank of Maryland, the United States, on the 2d of July, 1831, issued an attachment against the effects of the Elkton Bank; which attachment was laid on the effects of the bank, in the hands of George Beaston, on the 19th of October, 1831.

The answers to the interrogatories filed on behalf of the United States by George Beaston, stated "that prior to the time of laying the attachment in this cause, he was indebted to the Elkton Bank of Maryland, in the sum of five hundred dollars, or thereabout, with interest from some time in 1828; (the period not now exactly recollected;) that in October, in the year 1830, an attachment at the suit of the Farmers' Bank of Delaware against this deponent, as garnishee of the Elkton Bank of Maryland aforesaid, was served on him, returnable to Cecil county court, where the said attachment, last mentioned, is still depending: that, at the time of the service of the attachment in this cause, at the suit of the United States, the said sum of five hundred dollars, and interest, was in the hands of deponent, and still remain so; who claims to retain the same, as he is held liable to the payment of the attachment first served on him, at the suit of the Farmers' Bank of Delaware aforesaid; and as he considers himself entitled to a set-off, as is hereinafter stated. Deponent further says, that he does not exactly recollect the time when said debt was contracted, as he has had various negotiations with said bank; but that, at the time he received money from said bank as a consideration for his debt, it was received in the notes of the said Elkton Bank; which were then, as he believes, in a state of depreciation of from ten to twenty per cent. on their nominal value."

VOL. XII.—O

That since the service of the summons in this cause, he has not paid to the Elkton Bank aforesaid, or to any other person, for the use of said corporation, any part of the money aforesaid; nor has he made any transfer of goods, property, or effects, to secure the payment thereof, or any part thereof; that he is the bona fide holder and owner of notes of the Elkton Bank aforesaid, of the value nominally of eight hundred and forty-two dollars and thirty-one cents; and he claims to set-off against any demand made in this, or any other proceeding against him, for the debt aforesaid, so many of the said notes at their nominal value, as may be equal to the sum claimed from him in this attachment, as garnishee of said bank.

George Beaston also filed a plea of nulla bona, in the following words: "That the said United States of America, condemnation of the said sum of money in the attachment aforesaid, and return thereof specified in the hands of him, the said George Beaston, as of the goods, chattels and credits of the said president and directors of the Elkton Bank of Maryland, ought not to have; because he saith that the said George Beaston, at the time of laying the said attachment in the hands of him, the said George Beaston, he had not, nor at any time since hath had, nor now hath, any of the goods, chattels, or credits of them, the said president and directors of the Elkton Bank of Maryland, in his hands; and this he is ready to verify. Wherefore, he prays judgment whether the said United States of America, condemnation of the said money in the attachment aforesaid, and return thereof specified, as of the goods, chattels, and credits of the said president and directors of the Elkton Bank of Maryland, in the hands of him, the said George Beaston, to have, ought, and so forth."

The United States filed a replication to this plea, and issue being joined, the parties went to trial on the pleadings; and a verdict was found by the jury in favour of the United States, for six hundred and eighty-five dollars and sixty-six cents.

On the case thus agreed on, and the matter set forth and referred to in the same, the Cecil county court gave a judgment in favour of George Beaston; and the plaintiffs appealed to the high court of appeals of the state of Maryland. The judgment of the court of Cecil county was reversed by the court of appeals of Maryland; and the defendant prosecuted this writ of error to the Supreme Court of the United States.

The opinion of the court of appeals of Maryland, states the rea-

sons which induced that court to reverse the judgment of the court of Cecil county. It was as follows:

"Exemption is claimed by the defendant, from the operation of the attachment in' this case. Having had judgment of condemnation passed against him, for the amount he stood indebted to the Elkton Bank of Maryland, at the suit of the United States, and having paid the money under such judgment, he rests his defence upon an alleged priority given by the acts of congress to the government; and upon certain proceedings of the government had in the circuit court of the United States for the district of Maryland, for the recovery of his claims against the Elkton Bank of Maryland. The priority of the United States is supposed to be founded on the just construction of the laws of congress, making provision for the collection of her debts. We have been referred, in the argument, to the law of 1789, ch. 5, sec. 21: 1790, ch. 35, sec. 45: 1792, ch. 27, sec. 18: 1797, ch. 74, sec. 5: and the collection law to be found in the 3d vol. of the Laws of the United States, ch. 138, sec. 65. Interpretations of various decisions of the Supreme Court of the United States, and of the circuit courts, have been given to these acts of congress, which leave no doubt as to their construction. It will be, therefore, only necessary to refer to them. The two first acts above cited, had reference to bonds given for duties; and the third act above referred to, made provision in relation to the securities in such bonds. These acts gave a preference to the United States in all cases of insolvency, or where any estate, in the hands of executors or administrators, shall be insufficient to pay all the debts of the deceased; and it was declared that the case of insolvency referred to, should be deemed to extend to all cases in which a debtor, not having sufficient property to pay all his debts, should have made a voluntary assignment thereof for the benefit of his creditors, or in which the estate and effects of an absconding, concealed, or absent debtor, shall have been attached by process of law; or to cases in which an act of legal bankruptcy shall have been committed: and, by the two subsequent laws, the same provision was made, securing the priority of the United States, and applying them to all other debts due to the United States. In the year 1805, the Supreme Court were first called upon to put a construction upon these laws; and it was adjudged, in 3 Cranch, 73, that the United States would gain no priority, in case of a partial bona fide transfer of his property by the debtor; but could only obtain it by such a general divestment of property as would, in fact, be equiva-

lent to insolvency, in its technical sense. In 1810, the same court decided that the term "insolvency," as used in the first acts, and "bankruptcy," as used in the latter acts, are synonymous terms. That priority must be confined to the cases of insolvency specified in the act; and that insolvency must be understood to mean a legal, known insolvency, manifested by some notorious act of the debtor, pursuant to law; not a vague allegation which, in adjusting conflicting claims of the United States, and individuals against debtors, it would be difficult to ascertain; 8 Cranch, 431. The same construction has been maintained in 2 Wheat. 396, and 4 Peters, 386; and, in a very recent case, Mr. Justice Thompson says, "the act looks to a legal insolvency, where the property is taken up by the law for distribution among the creditors of the debtor. There is no difficulty in the construction of the statute, until we arrive at the last phrase, "*legal bankruptcy*." What is legal bankruptcy? In 1797, when the act of congress was passed, the United States had no bankrupt laws. The words, in their connection, seem to have reference to the previous cases put in the section, and to point out some legal insolvency or some mode of proceeding, by which the property of the debtor is taken out of his hands to be distributed by others; Paine's C. C. R. 629. Such being the construction of the acts of congress, giving the government a preference; we proceed to inquire whether the Elkton Bank was in such a situation as to impart to the United States this preference.

"The above facts demonstrate the inability of the Elkton Bank to pay her debts, as admitted in the statement, they could not, per se, give to the United States the preference contended for. It must, in the language of the authorities, be a known and legal insolvency; the former of which is not admitted, and the latter could not be predicated of such a condition.

"Does the act of 1829, ch. 170, with the proceedings consequent thereon, give rise to the priority contended for? This act provided for the election, *at the next annual* meeting of the stockholders, held in pursuance of their charter, of two trustees, to settle all the outstanding debts and credits of the bank; and further provided, that they should be elected in the same manner as the president and directors have been heretofore elected. By referring to the charter of the bank, it will be found that one of its fundamental laws required the president and directors to give one month's notice, in the most public places in the county, and in some public print in the city of Balti-

more, of the time and place of holding the election of directors annually: and it was furthermore, by a supplement to the said charter, required that the election for directors should take place on the fourth Monday of May. If it were conceded to the legislature, that they possessed power to wind up the concerns of this particular institution by such an act; it must be admitted, that the leading provisions of the act, calculated to apprize all interested of the fundamental changes about to be operated in its government, that they might have an opportunity of protecting their interests by their presence, should have been complied with in order to give legal efficacy to the acts done under it. So far, however, from this, we are informed by the statements that no notice was given; and that two persons were elected by a majority of the stockholders, on a different day from the day of the annual election of directors, as the trustees, who never accepted. So that the law was in truth never executed, but the proceedings held under it were undoubtedly inoperative and void, and could therefore not in any manner have operated as a *general divestment of property*, within the contemplation of the acts of congress, as upon this ground to have given the United States a preference; but, on the contrary, the charter still thereafter continued to exist, and its affairs were, or ought to have been rightfully managed and controlled by its then directors, who would continue in office for its government, and the exercise of its corporate functions, until such election should take place. Although no priority may exist on the part of the United States, it has been argued that the appointment of receivers, by the circuit court of the United States, to take charge of the property and effects of the Elkton Bank of Maryland, placed the debt due from the defendant so under the control of that court, as a court of equity, that it could be reached legally by no process of execution or attachment. It is true that money and effects in the hands of the assignee of a bankrupt, or the trustee of an insolvent debtor, cannot be attached; not only because such property stands assigned by operation of law: but because the allowance of such attachments would utterly defeat the whole policy of the bankrupt or insolvent laws; nor can money taken by a sheriff in execution, or money paid into court. Serg. on Attach. 99. But we apprehend that the appointment and bonding of receivers, does not work such disability. The property, by the order, is not taken under the protection of the court; and, until taken in charge by the receivers, its summary jurisdiction could not be interposed to

punish such as might cover it, or portions of it, by execution or attachment. The period when it might and ought legally to be considered as under the mantle of legal protection, should be the time when a court of chancery would interpose by attachment, for disturbing or interfering with the possession of the receiver.

"Innocent third persons might be previously affected by extending this doctrine further. It has been argued, and we think with much force, that there is and ought to be an analogy in this respect between the law applicable to receivers and sequestrators; as regards the latter, the court of king's bench have decided, that, when a sequestration is awarded to collect money to pay a demand in equity, if it is not executed, that is, if the sequestrators do not take possession, and a judgment creditor takes out execution, notwithstanding the sequestration awarded, there may be a levy under the execution. East's Rep. 9 vol. 335.

"So here, the receivers never obtained possession of the credits of the Elkton Bank of Maryland, its books and papers, or its evidences of debt: on the contrary, so far as we are enabled to collect the fact in this respect from the record, they were held adversely; the circuit court of the United States giving their aid and assistance to the receivers, to enable them to obtain the possession; with what effect we know not; except that we are left to infer, from the fact of the attachment subsequently issued against the defendant by the United States, that they never did obtain possession. We are not informed by the record, that the receivers ever took any steps whatever to assume control over the debt which the defendant owed the Elkton Bank: on the contrary, they take out an attachment in the name of the United States, and serve it on the defendant as garnishee, long after the attachment issued, and served by the plaintiff in this case; and indeed the statement admits that they never attempted to exercise a control over this debt. Lastly, it is urged that the judgment of condemnation obtained against Beaston, by the United States, should operate as a bar against the recovery by the plaintiff in this case. It is undoubtedly a hardship on the defendant to be compelled twice to pay the same debt, but it must be recollected that the plaintiff had a prior attachment, which operated as a lien: and it would be a still greater hardship that such plaintiff should lose his lien, thus legally acquired, by the judgment of a court in a cause to which he was no party, and of which we have no evidence that he had in any manner any notice. If the defendant failed to take the proper

steps, in the predicament in which he was placed, to defend and protect his interests, it is but fair that he should suffer the consequences. Had notice been given of this attachment by the United States, the plaintiff might have vindicated his rights, and had an opportunity of asserting his anterior lien; and of obtaining the decision of the appellate court, had it become necessary. Nor is it prescribed why it would not have been competent for the defendant, in this conflict of claims against him, to have brought the conflicting parties into chancery, where the rights and priority of each might have been adjudicated without prejudice to him. But, last of all, would the defendant be entitled to avail himself of the judgment of the United States recovered against him, since, from the examination of the record of that suit, it appears that his defence was taken solely on the plea of nulla bona; a defence which could certainly have been of no avail, when it appeared, by the answers filed in the interrogatories of the United States, that he was indebted to the Elkton Bank of Maryland: although, in the answers, he adverts to the attachment issued against him by the Farmers' Bank of Delaware, he has not plead such prior attachment as pending against him, whereby he could obtain the opinion of the court in relation to its priority. In every aspect, therefore, in which we can view the decision below, we are brought to the conclusion that it cannot be sustained.

"Judgment reversed, and judgment on the case stated for appellant."

The case was argued at the bar, by Mr. Martin and Mr. Butler, attorney general, for the plaintiff in error: and by a printed argument for defendants in error by Mr. John C. Groome. Mr. Butler also submitted a printed argument in reply.

For the plaintiff in error the following points were presented to the Court.

1st. That, according to a just construction of the acts of congress giving priority to the United States, in cases where their debtors are insolvent, the government was entitled to be paid the debt due to it from the Bank of Elkton, out of the effects of that institution, in preference to any other creditor; and the plaintiff in error having paid to the United States the amount of money in which he was indebted to the Bank of Elkton, he was, therefore, acquitted from the operation of the attachment sued out against im by the Farmers' Bank of Delaware.

2d. That judgment of condemnation having been obtained by the United States against the plaintiff in error, on an attachment in the circuit court for the district of Maryland, for the money in which he stood indebted to the Bank of Elkton; and he having paid that amount to the United States under the authority of said judgment, it operates as a bar to the recovery sought against him by the defendant in error.

3d. That the appointment of receivers, by the circuit court, to take possession of the property and effects of the Bank of Elkton, as disclosed by the record, placed the debt due from the plaintiff in error to that bank, in the custody and under the control of the circuit court, as a court of equity; and that it could not be legally reached by the process of attachment issued in this case by the Farmers' Bank of Delaware.

Mr. Martin, for the plaintiff's, stated that this case has been brought up to this Court, to settle principles by which, hereafter, future cases may be regulated; and thus, although the amount in controversy is small, the importance of the principles involved, will commend it to the consideration of the Court. After stating the case, he proceeded to say, that the first point is the question of the right of priority of the United States, under the act of congress, under the circumstances which are presented by the record. According to the received construction of the act of congress of 3d March, 1791, a body politic or corporate is within the meaning of the act.

2d. The Bank of Elkton having become insolvent, the priority of the United States attached; and the proceedings of the Farmers' Bank of Delaware could not operate against the rights of the United States, nor affect the debt due to the Elkton Bank in the hands of George Beaston.

The priority of the United States is fully settled in the case of The United States v. Fisher, 2 Cranch, 358. In that case it was decided, that the right of the United States to priority of payment of debts due to her, extends to all cases where any one is indebted to the government. The same principle will be found in Field v. The United States, 9 Peters, 182. Where there has been an open act of insolvency, the priority attaches; whether suit is, or is not instituted by the United States. 1 Paine's C. C. R. 628. This priority may be enforced by an action of assumpsit; by a bill in equity; or by any other legal proceedings.

[Beaston v. The Farmers' Bank of Delaware.]

It has been said in this case, in the courts of Maryland, that cor-- porations are not within the provisions of the act of congress; because the persons who compose the corporation are merged in it. But this is denied, and it is maintained, that a corporation is a person within the law; and that a corporation is fully within the meaning and purpose of the law. Corporations are persons; they are so treated in all the laws and proceedings relative to taxation. Coke's Institutes, 697, 718. In the exposition of the Statute of Henry 5, Lord Coke says: Every corporation is included in the term "inhabitant;" although the corporation is not named. In Cowper's Rep. 79, the court of king's bench decided, that a corporation comes in under the term "inhabitant." So also, in the case of The Bank of the United States v. Deveaux, 6 Cranch, 51; it was held, that a corporation composed of citizens of one state, may sue a citizen of another state, in the courts of the United States. The same principle will be found in the opinion of Mr. Justice Thompson, when in the supreme court of New York; in the case of The People v. The Utica Ins. Company, 15 John. Rep. 351.

A corporation being within the act of congress, if before the attachment of the Bank of Delaware, the Elkton Bank had become insolvent, the priority of the United States had attached: what was the situation of the Elkton Bank; what are the evidences of its insolvency?

This is shown by the return of nulla bona, to the attachment against the bank; by the inability of the bank to discharge its debts. In fact, there was no banking operations by the bank after 1829; no meeting of the stockholders: and all its operations as a bank were arrested, because of its entire and absolute inability to pay its debts.

In 1829, the corporation was at Annapolis, asking for a special act of insolvency; and on this application of the bank, the legislature passed an act which authorized the appointment of trustees, who were to take possession of the whole property and effects of the bank, and wind up its whole concerns. Maryland Laws of 1829, chap. 170, Harris's Compilation. These acts combined, demonstrate, fully and unquestionably, the insolvency of the bank.

It is contended, 1st. That if there was no legal transfer of the effects of the bank to trustees, in consequence of the irregularity of the proceedings of the stockholders, or from any other cause this Court will pronounce the bank to have been insolvent; because of its situation, and from its various acts, and the circumstances of the case.

[Beaston v. The Farmers' Bank of Delaware.]

2d. That if it is necessary there should be an assignment to constitute a legal insolvency, and thus to bring the case within the provisions of the act of congress, the corporation was completely denuded of all its property; and the act of the legislature of Maryland, of 1829, was an assignment of all the property of the bank. Cited Prince v. Bartlet, 8 Cranch, 431. The acceptance of the assignment is not necessary to show the insolvency of the assignor. In the court of appeals it was conceded, that if trustees of the bank had been appointed, the insolvency of the bank would have been established. The irregularity of their appointment can have no influence on the question. It is the condition of the bank, and its application to the legislature, followed by the proceedings of the stockholders appointing the trustees; although not according to the requirements of the law; which make out the insolvency.

The appointment of receivers by the circuit court of the United States for the Maryland district, was also a judicial assignment of all the effects of the bank. If a statutory assignment, or an individual assignment, gives the preference to the United States; why should not a judicial assignment have the same operation? As to the effects of the appointment of receivers, cited, 3 Wendell's Rep. 1.

The party in this case, paid the money in obedience to the judgment of a court of competent jurisdiction. This is a full protection for the payment; and no other court can question the propriety of the judgment of the circuit court of Maryland; or of the acts of the defendant in obedience to that judgment. Cited, 5 Johns. Rep. 101; 2 East, 266. It was said, in the court of appeals, that the Bank of Delaware might have appealed from the circuit court of the United States to this Court. But there is error in this assertion. The sum in controversy was too small for a writ of error, or for an appeal.

It is claimed that receivers having been appointed by the circuit court in 1830, and they having entered on their duty, and assumed the trusts delegated to them; all the property and effects of the bank went into their hands, and no part of the same was afterwards liable to attachment. The attachment by the Farmers' Bank of Delaware, was after the appointment of receivers in the circuit court. The receivers were appointed in June; the attachment was not laid until September.

It has been said, that the receivers did not take possession of the debt due by Beaston, the plaintiff in error; that they could have no manual possession of this debt. As to what an attachment is, and

what property can be attached; cited, 1 Penna. Rep. 117; 1 Dall. 3; 3 Binney's Rep. 294; 2 Maddock's Chancery, 187, 294.

Mr. Butler, upon the question, whether "person" in the act of congress giving a priority to the United States, said; that wherever "person" is used in a statute, with a quality attached to it which does not apply to a corporation, the Court will construe the statute so as to comprehend persons: if the spirit and purpose of the law will be accomplished by their doing so. Whereyer the words of a statute can be extended to artificial persons, and where the acts done or to be done by corporations are within the spirit of the law, they will be extended to comprehend them. In all these cases, and wherever it is necessary, the Court will look at the composition of the corporation.

Persons, in law, are artificial as well as natural persons; and in the act of congress there is nothing which is not equally applicable to both. The object of the statute was to include all persons. Its purpose was to secure debts due to it, from whomsoever might become indebted to the United States; and a corporation is certainly within the general sense of the statute.

As to the insolvency of the Elkton Bank, it was plain and manifest at the time of the proceedings by the United States against Mr. Beaston. The act of congress applies to a case where the insolvency is manifest. What can manifest the insolvency of the bank more than what is shown in the record. The bank had ceased its operations, as a bank; the stockholders had ceased to appoint directors to manage its concerns. An application was made in 1829, to the legislature of Maryland, for the appointment of assignees, or trustees, who were to take possession of all its property; and this application was a full manifestation of the total insolvency of the institution.

Mr. Groome, for the defendants in error.

At April Term, 1830, of Cecil county court, the Farmers' Bank of Delaware obtained a judgment against the Elkton Bank of Maryland. On the 24th day of September following it had an attachment issued on this judgment, in conformity with the laws of Maryland, 1715, ch. 40, sec. 7; and attached in the hands of Beaston, the plaintiff in error, the sum of five hundred dollars, &c., due to the said Elkton Bank on a judgment at September Term, 1828, of the same court. Beaston resisted this attachment, and a judgment was

[Beaston v. The Farmers' Bank of Delaware.]

rendered in his favour against the Farmers' Bank at April term, 1834; on the statement of facts to be found on the 8th, 9th, and 10th pages of the printed record. From this judgment an appeal was prayed to the court of appeals of Maryland, and there it was reversed. Subsequently, by a writ of error, it has been brought up to this Court; and the question for decision is, whether, at the time of issuing and levying the said attachment, there was any existing lien on behalf of the United States, or of any other creditor of the Elkton Bank, on the specific debt attached; or any other circumstance or relation between the Elkton Bank and any of its creditors, either then existing or subsequently arising, which could overreach the attachment, and defeat its operation?

It cannot be contended that the record discloses any lien existing at that time. The judgment rendered in favour of the United States against the Elkton Bank, could not operate as a lien on any debt due to the Elkton Bank. Neither was any such lien created by the fieri facias issued on that judgment to April term, 1830. It had already, on the 8th day of April, 1830, been returned with an endorsement of nulla bona, by the marshal; and was, under no circumstances, the proper process of execution to reach the credits of the Elkton Bank, and could of course have no effect upon the debt due from Beaston. Nor could any priority, (as will appear hereafter to be claimed on behalf of the United States,) operate as a lien on this debt. This Court has held, that no lien is created in favour of the United States by the law of priority. United States v. Fisher et al. 2 Cranch, 358; Conard v. The Atlantic Insurance Company, 1 Peters, 440; United States v. Hooe et al. 3 Cranch, 73.

It is said, however, that although no actual lien may have existed in favour of the United States, or any other creditor of the Elkton Bank; yet the United States were, by reason of their judgment, and other circumstances stated in the record in this cause, entitled to a priority of payment out of the funds of the Elkton Bank: and this priority, existing at the time when the attachment was issued on the judgment of the Farmers' Bank, superseded and defeated that attachment. Supposing it to exist in this case, "what, then, is the nature of the priority thus limited and established in favour of the United States? Is it a right which supersedes and overrules the assignment of the debtor as to any property which afterwards the United States may elect to take in execution, so as to prevent such property from passing, by virtue of such assignment, to the assignees?

[Beaston v. The Farmers' Bank of Delaware.]

Or is it a mere right of prior payment out of the general funds of the debtor in the hands of the assignees? We are of opinion (said this Court) that it clearly falls within the latter description; and that the debts due to the United States are to be satisfied by the assignees, who are rendered personally liable, if they omit to discharge such debts." Conard v. The Atlantic Insurance Company, 1 Peters' Rep. 439. Again, in the case of The United States v. Fisher et al., this Court held that no lien is created by this law of priority; no bona fide transfer of property in the ordinary course of business is overruled. It is only a priority of payment, which, under different modifications, is a regulation in common use. See 1 Peters' Rep. 440. It does not partake even of the character of a lien on the property of public debtors. United States v. Hooe et al. 3 Cranch, 73. If, then, debts due to the United States constitute no lien on the property of the debtor, and have merely preference of payment out of the debtor's funds in the hands of assignees; how can the existence of such debts operate to defeat any lien subsequently acquired by any other bona fide creditor; or, in other words, how can a debt due to the United States, and merely entitled to a priority of payment out of the funds of the Elkton Bank in the hands of its assignees, be held to defeat a lien on a specific credit, acquired in favour of the Farmers' Bank by attachment? It is a solecism to say that such a debt, or such priority is no lien; and yet give to it all the properties, attributes and effect of a lien. In this manner did this Court reason when it said that "if a debtor of the United States, who makes a bona fide conveyance of part of his property for the security of a creditor, is within the act which gives a preference to the government, then would that preference be in the nature of a lien from the instant he became indebted." 3 Cranch, 73. But it will be recollected that the fund attached in this case was not chattels or land in the actual custody and under the immediate control of the Elkton Bank; but a chose in action, a debt, due from a third person to that institution, under a judgment which, at the time of the attachment, had never been paid, and which required the use of coercive measures to reduce it into possession. It would seem to be carrying the principle of priority very far to apply it to such a case. The third person cannot be presumed or expected to know the condition of his creditor's affairs; whether he be indebted to the United States or not; and whether, if indebted, the United States have any right to priority of payment out of his estate; and if he did know such to

be the condition of his creditor, he is in no wise responsible for the proper application of his creditor's property. The United States have their remedy against the assignees, and not against the property of their debtor. Their priority never attaches on lands or goods, as the lands or goods of the debtor; it attaches on the fund, and not on the specific property. It does not operate to prevent the passing of the property either to assignees in bankruptcy, or to assignees under a conveyance, or to executors and administrators. It amounts only to a right to previous payment out of the fund then in the hands of others. Such was the argument of counsel, and such appears to be the effect of the decision in the case of Conard v. The Atlantic Insurance Company.

So far the argument has proceeded on the hypothesis, that, in this case, a priority under the acts of congress in favour of the United States, did exist: but it is denied that the United States ever had such priority of payment against the Elkton Bank. The priority claimed is derived from certain acts of congress. These several acts are the act of 31st July, 1789 ch. 5, sec. 21: the act of 4th August, 1790, ch. 35, sec. 45: the act of 1792, ch. 27, sec. 18: the act of 3d March, 1797, ch. 74, sec. 5: and the act of 2d March, 1799, ch. 128, sec. 65. All of these acts, except that of 1797, confined the priority of the United States to custom-house bonds, and bonds taken under the collection act; and some of them placed the surety in such bonds, who paid the debt, on the same footing in respect to priority, as the United States. It was the act of 1797 that went further, and gave a preference to the United States in all cases whatsoever, whoever might be the debtor, or however he might be indebted; when the debtor became insolvent, or when, after his death, his estate in the hands of his executors or administrators should be insufficient for the payment of his debts: and it provided, that the priority should be deemed to extend as well to cases in which the debtor, not having sufficient property to pay all his debts, shall have made a voluntary assignment thereof for the benefit of his creditors; or in which the estate and effects of an absconding, concealed, or absent debtor shall have been attached by process of law; as to cases in which an act of legal bankruptcy shall have been committed. In giving a construction to these statutes, this Court has held that they only apply to two general classes of cases, viz: a living insolvent, having an assignee; and a dead insolvent represented by executors or administrators; Conard v. Nicoll, 4 Peters' Rep. 308: that the priority, as against living debtors,

[Beaston v. The Farmers' Bank of Delaware.]

only existed where the debtor had become actually and notoriously insolvent, and, being unable to pay his debts, has made a voluntary assignment of all his property; or, having absconded, or absented himself, his property has been attached by process of law. See United States v. Hooe, 3 Cranch, 73; 1 Peters, 439. The words bankruptcy, and insolvency, mentioned in the statutes, are used as synonymous terms; and must be understood to apply to cases of insolvency specified by the legislature; and to mean a legal and known insolvency, manifested by some notorious act of the debtor, pursuant to law; Prince v. Bartlett, 8 Cranch, 431; or where, by operation of law, the property of the debtor is taken out of his hands to be distributed by others; United States v. Clark, 1 Paine's C. C. R. 629; and see Thellusson v. Smith, 2 Wheat. Rep. 396: or where the property is in the hands of assignees, not by voluntary assignment only, but by assignment made in virtue of any state bankrupt law, or, possibly, of any bankrupt law of the United States, which might thereafter be passed. Conard v. Nicoll, 4 Peters' Rep. 308. It is not a mere inability of the debtor to pay all his debts, but that inability must be manifested in one of the three modes pointed out in the explanatory clause of the section. 1 Peters' Rep. 439. From the several statutes and decisions cited, it appears that the United States, as creditors, have a preference in the following cases:

1. Where the debtor is dead, leaving an insufficiency of assets in the hands of his executors or administrators to pay his debts.

2. When his effects have been attached by process of law, as an absent, concealed, or absconding debtor.

3. Where there is bankruptcy, or legal insolvency of the debtor, manifested by some act pursuant to law: and

4. Where he has made a voluntary assignment of all his property for the benefit of his creditors.

Did the Elkton Bank, at the time of issuing the attachment in favour of the Farmers' Bank, come within either one of these four classes?

1. It was certainly at that time an existing institution, in the full possession of its chartered rights and powers; and could not be even assimilated to the condition of a deceased debtor. The failure of the stockholders of the Elkton Bank to elect officers in 1830, and since; even with their continued omission to carry on their usual banking operations; could be regarded, in the worst aspect, as only cause of forfeiture, and is not, per se, an actual forfeiture. A corporation may

forfeit its charter, under certain circumstances, by non user or mis-
user of its franchises; but such forfeiture can only be enforced by
judicial proceedings instituted for that purpose, at the instance of the
government; and no cause of forfeiture can be taken advantage of,
collaterally or incidentally; nor indeed in any manner, until the de-
fault has been judicially ascertained and declared, by a suit instituted
on behalf of the state for that purpose. Chesapeake and Ohio Canal
Company v. Baltimore and Ohio Rail Road Company, 4 Gill and
Johns. R. 107; Trustees of Vernon Society v. Hill, 6 Cow. 23; King
v. Amery, 2 T. R. 515. Besides, it is the general principle of law,
that it is incident to all corporations, that in case of a failure to elect
at the time appointed, the old officers shall remain in office. Stra. 625,
10 Mod. 146. One of the supplements to the charter of the Elkton
Bank contains a provision to the same effect. Laws of Maryland,
1815, ch. 148; see 6 Gill and Johns. R. 230. But this point is too
self-evident to require further discussion.

2. There has been no attachment of the effects of the Elkton
Bank, as an absent, concealed, or absconding debtor. The attachment
of the Farmers' Bank, in this case, is a process in the nature of an
execution: is, as such, authorized by the laws of Maryland, 1715, ch.
40, sec. 7: and is not predicated of the absence or concealment of
the debtor, the Elkton Bank.

3. Here was no known and legal solvency; none admitted in the
statement of facts, and none arising by inference therefrom; but a
mere inability to pay debts; which is not the insolvency contem-
plated by the acts of congress, and does not, per se, give to the Uni-
ted States the preference claimed, 1 Peters' R. 439. The insolvency
mentioned in the statutes, refers to insolvency under the state laws,
and perhaps to a bankrupt law of the United States, when one should
pass. 4 Peters' R. 307-8; Prince v. Bartlett, 8 Cranch R. 431. And
a corporation is not within the state laws on that subject; State of
Maryland v. Bank of Maryland, 6 Gill and John. 221: being inca-
pable of imprisonment; or of availing itself of the benefit of their
porvisions.

4. Here was no voluntary assignment by the Elkton Bank, for the
benefit of its creditors. No such assignment is expressly admitted,
and none such can be implied. The act of the legislature of Mary-
land, 1829, ch. 170, cannot be deemed to be such an assignment. By
that act, the stockholders of the Elkton Bank were merely autho-
rized, at their next annual meeting, held in pursuance of their char-

[Beaston v. The Farmers' Bank of Delaware.]

ter, to elect two persons as trustees, who should have power to adjust and settle all the outstanding debts and credits of said bank; who should be privileged to sue, and be liable to be sued; and be elected in the same manner as the president, and directors had been, and in their place and stead. A charter being a contract, within the purview of the constitution, which cannot be destroyed, modified, altered, or impaired, without the assent of the corporators; this act, unless accepted and executed by the stockholders of the Elkton Bank, in the manner and on the terms prescribed by it, is a mere dead letter. It can make no difference, that it was passed on the application of the several persons, who were the acting president and the acting directors of the bank: for it is not conceded that they acted officially: and if they did, they acted without authority, and in the exercise of powers that did not legitimately belong to their office.

And it is contended, too, that on principle, the acceptance must be the act of each corporator; for if it be a contract at all, it must be a contract with each. If not, and a majority of corporators can control the objects and purposes of the charter; then, after the creation of a charter for one purpose, and the contribution of the requisite funds for that purpose, a majority may, with the aid of the legislature, divert the funds from the object for which they have been subscribed by many; and apply them to a use opposed to their wishes, and destructive to their interests. At all events, it must be accepted and executed, either by a majority, or by the whole of the corporators; and in either case, the acceptance must be made in accordance with the act. The annual meeting of the stockholders had been fixed by law, 1815: ch. 148, to take place on the fourth Monday of May, in every year; and the charter required the president and directors to give one month's notice, in the most public places in the county, and in some public print in the city of Baltimore, of the time and place of holding the election of directors annually: Laws of Maryland, 1810, ch. 51, sec. 27, sub-sec. 3. Now, the fourth Monday of May, 1830, (after the proper preliminary notice had been given,) was the day when the next annual meeting would be held, in pursuance of the charter; and if any inference of the acceptance or execution of the act of 1829 can be drawn from the conduct of the stockholders, in the absence of any express resolution to that effect, it should be derived from their election of trustees, in conformity with that act on that day. On that day, however, no such election was attempted; but on a different day, viz:

Vol. XII.—Q

on the third Monday of May, without any previous notice whatever, and without any authority, two persons were elected by a majority of the stockholders, as trustees; but these persons never accepted. The act of 1829 was, therefore, never regularly accepted, and never executed, and all the proceedings under it being unauthorized, were necessarily void; and could not operate as a general divestment of the property of the Elkton Bank, within the contemplation of the acts of congress, so as to give the United States the preference over other creditors.

The effects of the Elkton Bank never went into the hands of any persons for distribution; the trustees elect refused the office; and there was, therefore, no assignee to whom they were assigned, or who could be made liable to the United States. The contingency whereon the transfer was to be made under the act, viz: the substitution of trustees in the "place and stead" of directors, did not happen. The transfer was therefore never consummated. An act of bankruptcy, or what would be such under the bankrupt laws of England, is not sufficient to give rise to the preference of the United States, from the moment of its commission; for there is no assignee, who is first to satisfy the claim of the United States out of the estate of the debtor, under the penalty of satisfying it out of his own estate, 4 Peters, 308. It is important, then, that there should be an existing assignee, having the property in his hands for distribution; indeed, it is essential that there should be. In the case of Brent v. The Bank of Washington, the plaintiff's testator had executed an assignment to certain persons, of all his estate, for the payment of the claims of the government, and his other creditors, as far forth as the estate would answer. The assignees refused to accept the assignment, or to act under it; and for this reason, the attorney general admitted, and this Court decided, the deed to be inoperative. 10 Peters' R. 597, 610, 611. The refusal of the trustees to act, therefore, apart from the irregularity of their appointment; would of itself defeat any claim of priority on the part of the United States in this case. But it is evident, from a perusal of the act of 1829, that it was never intended or understood by the legislature, or the Elkton Bank, as a voluntary assignment of property for the benefit of creditors, in the meaning of the acts of congress. It was merely a proceeding preparatory to the final adjustment of the affairs of the Elkton Bank, on the expiration of its charter, in a few years thereafter. The trustees were to have the privilege

of suing, and to be liable to be sued, in the same manner as the president and directors. They were to be elected in the same manner in which they had been elected, and in their place and stead. It was nothing more than the substitution of two men for twelve, in the administration of the bank—of trustees for directors. The act does not contemplate the immediate adjustment of the concerns of the institution; nor does it, in terms, restrict the trustees from carrying on the usual operations of the bank; but on the contrary, it expressly directs that they shall be elected in the place and stead of the president and directors; and as if their duties were not intended to expire but with the charter itself, it requires them, at every annual meeting thereafter, to exhibit to the stockholders a just and true statement of all their doings as such trustees. It made them responsible to the stockholders directly, as the president and directors were, and not to the creditors; and is predicated of no insolvency, actual or technical. And that the passage of this act, and the subsequent irregular proceedings under it, wrought no real change in the situation of the effects of the Elkton Bank, is manifest, from the view afterwards taken of the subject by the government itself; when it attached the same debt due from Beaston, in his hands as garnishee of the president and directors of the Elkton Bank: thereby clearly showing that it never regarded the property of the Elkton Bank, or this debt at least, as having ever passed by any assignment, actual or constructive, out of the possession of that institution, for the benefit of creditors, within the meaning of the acts of congress.

That this construction of the act of 1829, and this conjecture of its scope and object are correct, is further confirmed by the fact, that the power and authority of the legislature were invoked. The consent of that body was absolutely necessary, to vest the administration of the affairs of the bank in two instead of twelve persons, as the charter expressly confided its management to the latter number of persons; whereas, it will not be denied, that, if the object had been merely to make an assignment of property for the benefit of creditors, in the meaning of the acts of congress, the corporation had this power in its own hands, without the sanction or intervention of the legislature; and could have effected its purposes at once, by a deed assigning and conveying all its property to assignees or trustees. The State of Maryland v. Bank of Maryland, 6 Gill and Johns. 220.

There is nothing in the charter of the Elkton Bank to restrain it from so doing. If this power be denied to a corporation, then a cor-

poration can never be brought within the operation of the statutes giving priority. It is not within either one of the enumerated classes of cases. It cannot be a deceased debtor, with an insufficiency of assets in the hands of executors or administrators. Its effects cannot be attached as those of an absent, concealed, or absconding debtor; for such a state of things cannot be possibly predicated of a corporation. It cannot be a technical insolvent, under the state laws; and if it cannot transfer its property to trustees, for the payment of its debts, without the intervention and permission of another; it cannot make a voluntary assignment. Indeed, it may be greatly doubted, from the phraseology of the act of 1797, whether it was ever intended to apply to corporations. Before this branch of the argument is concluded, it must be observed, that up to this point, this case is considered as analogous to the case of Prince v. Bartlett, 8 Cranch, 431. There, the effects of an insolvent debtor, duly attached by an individual creditor, in June, were considered not to be liable to the claim of the United States, on a custom house bond, given prior to the attachment, and put in suit in August following. And to the facts and principles of law, in Prince v. Bartlett, the particular attention of this Court is asked.

But it is contended, that the appointment of receivers by the circuit court wrought some change in the condition, either of the parties in this suit, or of the debt due from Beaston; so as to defeat the attachment of the Farmers' Bank, subsequently issued. It cannot be regarded as an assignment under the statutes, for at least it was not voluntary. The appointment of receivers is a discretionary power, sometimes exercised by a court of chancery as a measure of security against waste, mismanagement, &c. and is provisional only for the more speedy getting in of a party's estate, and securing it for the benefit of such person as appears entitled; and does not affect the right. 2 Madd. Chan. Prac. 187–8. It transfers no title. It does not even alter the possession of the estate in the person who shall be found entitled at the time the receiver was appointed; so as to prevent the statute of limitations running on during the right in dispute. 2 Madd. 188. The appointment of receivers, therefore, in this case, did not affect the right of the parties to this or any other suit, or change the condition of the debt; unless it had the effect to place it under the immediate control of the circuit court, as a court of equity, and thus protect it from all process of execution or attachment. It is said, in support of this position, that money, held by a person as

assignee of a bankrupt, or trustee of an insolvent, cannot be attached for a debt due by the bankrupt or insolvent, at the suit of any particular creditor. Sergeant on Attachment, 83. But the reason is obvious. An assignment, in law or in fact, divests the bankrupt or insolvent of the property, and transfers it to the assignee in trust for the creditors in general: so that the bankrupt has no interest to attach. And besides, to permit an attachment in favour of a particular creditor to lie, would be subversive of the whole policy of the bankrupt and insolvent laws; under which the assignment is intended to operate for the benefit of all creditors. And so with regard to property or money taken by a sheriff in execution, or money paid into court, it is considered as already in the custody of the law. But the appointment of receivers is, per se, no transfer or assignment of the property into their hands; nor does it bring the property, until taken into the actual possession of the receivers, under the protection of the court, so that the court can punish for any interference with it by attachment or otherwise. Indeed, this position is admitted and assumed by the United States; and it may be added, by the judges of the circuit court themselves, in the proceedings which were had in that court to recover the judgment in favour of the United States against the Elkton Bank.

The debt from Beaston was not regarded in those proceedings as actually or constructively in the possession, or under the control of the receivers, or under the immediate protection of the court; else why was an attachment, similar in all its features to the attachment of the Farmers' Bank, issued in the same manner, for the same debt, and against the same person? Why was not that process, or some other, directed against the receivers, if the appointment of them operated as a transfer or assignment of this debt? Why, too, if after the appointment of them, any intermeddling, by the Farmers' Bank, with the property or credits of the Elkton Bank, was a contempt of the circuit court; did the judges of that same court, sitting as a court of law, authorize (without requiring leave to be asked) similar proceedings in favour of the United States? Besides, it is not understood how Beaston can avail himself of any act of contempt, on the part of the Farmers' Bank, towards the circuit court, as a defence to an action at law against him; when no interference on the part of that court has been attempted or sought. Until the case of Angell v. Smith settled the question, it seems to have been a matter of doubt, whether an ejectment might not be brought, without leave of court,

for lands even in the actual possession of a receiver, under the appointment of the court. 9 Vesey, jr., R. 335. There the court determined the question in the negative, by regarding the case of receivers as analogous to that of sequestrators; stating that it was clearly a contempt of court to disturb sequestrators in possession. Now, if the analogy between sequestrators and receivers be so striking as to compel the court to determine the law in one respect as to the one, by ascertaining how it stood in relation to the other; there can be no reason for supposing that it would not apply the same principles of law to both, in every case where the analogy could be traced. In the same case of Angell v. Smith, the chancellor said, that the court of king's bench had decided that, where a sequestration is awarded to collect money, to pay a demand in equity, if it is not executed: that is, if the sequestrators do not take possession; and a judgment creditor takes out execution, notwithstanding the sequestration awarded, there may be a levy under the execution: and hence I think that it may with reason be inferred, that if a receiver does not take possession, and an execution or attachment issues at the suit of a creditor, there may be a levy. Here it is admitted, that up to the time of the decision of the Supreme Court, which was long subsequent to the date of the attachment in favour of the Farmers' Bank, the receivers never had collected or received, or by any process of law, attempted to collect or receive, the debt due from Beaston. This decision, in the case of Angell v. Smith, and the reasoning of the court, is deemed conclusive on this point of the case.

But in the last place, it is urged that the judgment of condemnation against Beaston, in favour of the United States, (which was rendered a long time after the date and service of the attachment in favour of the Farmers' Bank,) and the subsequent payment thereof by Beaston; should operate as a bar to the recovery of the Farmers' Bank in this case. To the suit or proceedings on which this judgment of condemnation was rendered, the Farmers' Bank was not a party or privy. It is unnecessary to multiply authorities to show that no one is bound by a judgment, unless he be a party to the suit, or in privity with the party. 1 Wheat. 6; 7 Cranch, 271. If the other points in this cause cannot avail Beaston, as matters of defence, the rendition of the judgment of condemnation cannot; as it will then be evident, that if he had resorted to this Court, as an appellate court, to review the decision of the circuit court, or had afforded the Far-

[Beaston v. The Farmers' Bank of Delaware.]

mers' Bank, (by giving notice of the attachment of the United States,) an opportunity of vindicating its rights by so doing, he would have escaped the consequences of that judgment; as the facts involved in that case are the same which exist in this. In the concluding language of the opinion of the court of appeals of Maryland, "it is undoubtedly a hardship on the defendant (Beaston) to be compelled twice to pay the same debt. But it must be recollected that the plaintiff (the Farmers' Bank) had a prior attachment, which operates as a lien; and it would be a still greater hardship that such plaintiff should lose his lien, thus legally acquired, by the judgment of a court, in a cause to which he was no party, and of which we have no evidence that he had, in any manner, any notice. If the defendant failed to take the proper steps, in the predicament in which he was placed, to defend and protect his interests; it is but fair that he should suffer the consequences. Had notice been given of this attachment by the United States, the plaintiff might have vindicated his rights, and had an opportunity of asserting his anterior lien; and of obtaining the decision of the appellate court, had it become necessary. Nor is it perceived why it would not have been competent for the defendant, in this conflict of claims against him, to have brought the conflicting parties into chancery; where the rights and priority of each might have been adjudicated without prejudice to him. But last of all, would the defendant be entitled to avail himself of the judgment of the United States, recovered against him; since, from the examination of the record of that suit, it appears that his defence was taken solely on the plea of nulla bona; a defence which could certainly have been of no avail, when it appeared, by the answers filed to the interrogatories of the United States, that he was indebted to the Elkton Bank of Maryland: and although in the answers, he adverts to the attachment issued against him by the Farmers' Bank of Delaware, he has not plead such attachment as pending against him, whereby he could obtain the opinion of the court in relation to its priority. In every aspect, therefore, in which we can view the decision below, [Cecil county court,] we are brought to the conclusion that it cannot be sustained." In conclusion, it is added, that it appears clearly that this opinion of the court of appeals of Maryland, must be sustained by this Court throughout.

Mr. Butler, attorney general, in reply:

Most of the views presented by the learned counsel for the de-

fendant in error, have been sufficiently met in the oral arguments at the bar; to. which, and especially to the argument of the associate counsel, the Court are respectfully referred.

In addition to the reasoning and authorities then submitted, the following remarks are offered:

1. It is conceded, that no lien on the property of the debtor is created by the statutes, until the priority given by them actually attaches. If, therefore, before the right of priority accrues, the debtor makes a bona fide conveyance of his estate to a third person, or mortgages it to secure a debt; or if his property be seized under an execution, or be attached in cases where such a remedy is given; the United States, though the facts necessary to entitle them to a preference should afterwards occur, will have no claim on the property so sold, mortgaged, levied on, or attached.

Even when the priority of the United States has actually attached, there is, strictly speaking, no lien on the property in the hands of the executors or administrators, assignees, or trustees, as the case may be; but only a claim on the fund in their hands, and various remedies against them for its faithful application. That is to say, the executors, &c. may sell the property and transfer a valid title, and the purchaser will hold it free from any lien in favour of the United States; who cannot specifically reclaim the property from the purchaser, but must look to the executor, &c. But the right of the United States to be first paid, when the facts have occurred which give them a priority, is a right which will be protected; even before the debtor's property has been converted into money, by his executors, &c. in the same way, and to the same extent, as the right of any other cestui que trust. Thus, if the executors, &c. be insolvent, and be about to waste the property or misapply its proceeds, receivers may be appointed, at the instance of the United States; and they will be entitled to such other preventive remedies, as may be necessary to render their priority effectual.

After the priority has attached, the debtor's property is incapable of being levied on or attached by any other creditor, in any such way as to defeat that priority. If this be not so, the statutes giving the preference, would be useless; and that it is so, is necessarily implied, in every case on the subject decided by the courts.

The foregoing observations, it is believed, dispose of the introductory remarks of the defendant's argument.

[Beaston v. The Farmers' Bank of Delaware.]

2. The opposing argument denies, that the United States ever had any right to priority of payment against the Elkton Bank.

It is contended, on the part of the United States, that before the issuing of the attachment in favour of the Farmers' Bank, (Sept. 24th, 1830,) the United States had acquired, as against the Elkton Bank, a right to priority of payment out of its effects; not by the execution of a voluntary assignment of all its property, but by its insolvency, and its commission of an act of legal bankruptcy, within the meaning of the statutes in question. The whole argument under the fourth proposition, that there was here no voluntary assignment by the Elkton Bank, for the benefit of its creditors, may therefore be laid out of the case.

Our positions are, that the Elkton Bank was capable of becoming insolvent, and committing acts of legal bankruptcy, within the true intent and meaning of the acts of congress; and that it did so as early as December, 1829, when it applied to the legislature of Maryland for a special law to wind up its affairs: especially as this application had been preceded by a non user of the chief franchises of the corporation, from March, 1829, and the recovery of a judgment against them, in favour of the United States. This is not the case of mere inability to pay; it is a case of utter, acknowledged, and notorious insolvency; and these acts are acts of legal bankruptcy. In this view, it is of no moment whatever, that the trustees, under the special law, were not duly appointed, or did not accept; though, if the priority had been claimed here, as in Brent v. The Bank of Washington, 10 Peters, 597, on the ground of a voluntary assignment, those points would have been material.

If the Elkton Bank did not become insolvent, and commit acts of legal bankruptcy, in December, 1829; yet, when to the circumstances which had then occurred, we add the appointment of receivers, in April, 1830, by the circuit court, and the proceedings of the stock-holders, in May, 1830; surely we have an accumulation of notorious and decisive facts, exhibiting, in the fullest manner, and in pursuance of law, the utter insolvency of the corporation.

When the insolvency or acts of bankruptcy required by the statutes, have actually occurred, the priority eo instanti attaches; although some time may elapse before a trustee be formally appointed. Every person indebted to the insolvent, or in possession of his property, becomes, as to such debt or property, the trustee of the United States, from the moment he has notice of their priority. Should he

actually pay over the debt, or deliver the property to another creditor, pursuant to the judgment of a state court, before he has notice of the claim of the United States, this would undoubtedly protect him. But nothing of this sort occurred in the present case. Beaston, before the judgment recovered against him by the defendant in error, had received, through the summons of the United States, under the act of 1818; which was served on him, on the 19th of October, 1831; legal notice of the claim of the United States; and though he pleaded the pendency of the attachment in favour of the defendant in error, this plea was justly regarded as unavailing. Now, it will appear by the record, that, although Beaston was served with that attachment, in September, 1830, he was not required to plead to it until April term, 1834; when a case stated was agreed on by the parties, containing, among other things, all the proceedings in favour of the United States, together with the fact that the debt had been paid to them, agreeably to the judgment of condemnation.

The circumstances here stated, entirely distinguish this case from Prince v. Bartlett, 8 Cranch, 431, so much relied on by the other side. There, the property of the debtor was attached by his private creditors, on the 4th of June, 1810. He was then bound to the United States, in certain duty bonds, which, however, were not then payable; nor did they become payable until August, in which month they were put in suit. Executions in favour of the United States, were issued on the 18th of September following, when it appeared that the debtor was insolvent; but no legal act of bankruptcy had been committed even then. In this state of things, and especially as the debt to the United States did not become due and payable until after the service of the attachment; it was very properly decided that the United States were not entitled to the priority claimed by them. But the opinion of the Court, pages 433, 434, very clearly shows, that had the debt been due to the United States, and had a legal act of bankruptcy been committed, (as is contended is the case here,) before the service of the attachment, the priority would have attached, and would not have been defeated by the service of the attachment.

3. In answer to the remarks relative to the effect of the appointment of receivers, and on the judgment of condemnation, the learned argument of the counsel who opened the cause, on his second and third points, is referred to.

Mr. Justice M'KINLEY delivered the opinion of the Court.

This is a writ of error to the judgment of the court of appeals, for the eastern shore of Maryland, reversing the judgment of the Cecil county court.

The defendant in error sued out and prosecuted a writ of attachment fieri facias against the plaintiff in error, in said county court, upon a judgment, previously obtained, against the Elkton Bank of Maryland; upon which the sheriff returned that he had attached goods and chattels, rights and credits, of the president and directors of said Elkton Bank, in the hands of the plaintiff in error, the sum of five hundred dollars.

Upon the trial of the cause, the following agreed case was submitted by the parties to the court for its judgment: "It is agreed in this case, that in 1828, the United States instituted a suit against the Elkton Bank, in the circuit court of the United States, at the December term, 1829; a verdict and judgment were rendered in said suit, in favour of the United States, for twenty-one thousand two hundred dollars; on which judgment a fieri facias was issued at April term, 1830, and returned nulla bona: but it is admitted, that at the time, the said president and directors of the Elkton Bank had a large landed estate, which has been since sold, and applied to satisfy, in part, the said judgment; which landed estate, together with all other effects or property belonging to the bank, would not enable the bank to pay its debts, and that the same property and effects are not sufficient to pay the said debt due to the United States; and it is admitted, that the bank was then unable to pay its debts. An appeal was prosecuted, but no appeal bond given; and the judgment was affirmed in the Supreme Court, at the January term, 1832. At the April term, 1830, of the circuit court, a bill in equity was filed against the said bank, at the suit of the United States; and Nathaniel Williams and John Glenn were appointed, by an order of court, receivers, with authority to take possession of the property of said bank, to dispose of the same, and to collect all debts due to it, as appears by the record marked exhibit A; which receivers gave bond, on the 14th day of June, 1830, and proceeded to execute their trust. The records marked exhibit A and exhibit B, herewith filed, are to be considered as part of this case stated. At December session, 1829, application was made to the legislature of Maryland, by the several persons who were the acting president and directors of the said bank, for the act which was passed at that session, ch. 170; which, with all other acts

relating to said bank, are to be considered as part of this statement. A meeting of the stockholders, convened on the 17th day of May, 1830, which was the third Monday of said month, but without the notice mentioned and required by the act incorporating the bank, and its supplements; and at the said meeting, a majority of the stockholders appointed two trustees, in conformity with the provisions of said act, who declined accepting; and no trustees have ever since been appointed, nor has there since been an annual, or other meeting of the stockholders, or an election of directors; nor have there been any banking operations carried on by any persons professing to be the corporation of the Elkton Bank, since March, 1829.

" At September term, 1828, the Elkton Bank obtained a judgment against George Beaston for the sum which is attached in this suit; which, at the time of issuing and service of this attachment, had not been paid by Beaston. At April term, 1830, the Farmers' Bank of Delaware obtained, in Cecil county court, a judgment against the president and directors of the Elkton Bank for five thousand dollars, with interest from 9th December, 1825, till paid, and costs; and before the appointment and bonding of the receivers, as aforesaid, and on the 24th September, 1830, upon that judgment issued this attachment, and attached, in the hands of said Beaston, the sum of five hundred dollars; and after this attachment was issued and served, and after the affirmation of the judgment of the circuit court by the Supreme Court, attachment was issued by the United States, and the other proceedings had, as appears from the record marked B: and Beaston has actually paid and satisfied to the United States the amount for which judgment of condemnation was rendered against him in the circuit court. It is admitted, that up to the time of the decision in the Supreme Court, the said receivers had never collected or received, or by any process of law attempted to collect or receive, the said debt, attached in this case. The question for the opinion of the court is, whether the plaintiff can sustain the present attachment?" Whereupon the court rendered judgment in favour of the defendant; and, upon an appeal taken by the plaintiff, the court of appeals reversed the judgment of the county court.

In the argument here, the counsel for the plaintiff in error made the following points: First, the Elkton Bank of Maryland, is a person, within the meaning of the act of congress of the 3d of March, 1797, giving priority of payment to the United States: secondly, by a proper construction of that act, the plaintiff in error having paid to the

United States the amount which he owed to the Elkton Bank, is not liable to the defendant in error: thirdly, the appointment of receivers by the circuit court, with power to take possession of the property of the bank, and to sell and dispose of the same, and to collect all debts due to it, was such an assignment of its property as to give the right of priority to the United States: fourthly, the election of trustees, by the stockholders of the bank, under the act of the Maryland legislature, was also such an assignment of the property of the bank as to give the right of priority to the United States: and for these reasons, they contended, the judgment of the court of appeals ought to be reversed.

The counsel for the defenda·· in error resisted all the grounds assumed by the counsel for the plaintiff in error; and insisted that, by a fair construction of the fifth section of the act, and the former adjudications of this Court, the priority therein provided for, did not attach to the fund belonging to the Elkton Bank, in the hands of the plaintiff in error.

The section referred to is in these words: " That when any revenue officer, or other person hereafter becoming indebted to the United States, by bond or otherwise, shall become insolvent, or where the estate of any deceased person, in the hands of executors or adminis-. trators, shall be insufficient to pay all the debts due from the deceased, the debt due to the United States shall be first satisfied; and the priority, hereby established, shall be deemed to extend as well to cases in which a debtor, not having sufficient property to pay all his debts, shall make a voluntary assignment thereof, or in which the effects of an absconding, concealed or absent debtor, shall be attached by process of law, as to cases in which an act of legal bankruptcy shall be committed."

From the language employed in this section, and the construction given to it, from time to time, by this Court, these rules are clearly established: first, that no lien is created by the statute: secondly, the priority established can never attach while the debtor continues the owner and in the possession of the property, although he may be unable to pay all his debts: thirdly, no evidence can be received of the insolvency of the debtor, until he has been divested of his property in one of the modes stated in the section: and, fourthly, whenever he is thus divested of his property, the person who becomes invested with the title, is thereby made a trustee for the United States, and is bound to pay their debt first out of the proceeds of the debtor's

property. The United States v. Fisher, 2 Cranch, 358; The United States v. Hooe et al. 3 Cranch, 73; Prince v. Bartlett, 8, Cranch, 431; Conard v. The Atlantic Insurance Company, 1 Peters' Rep. 439; Conard v. Nicholl, 4 Peters' Rep. 308; Brent v. The Bank of Washington, 10 Peters' Rep. 596.

If the Elkton Bank of Maryland is not a person, within the meaning of the act, no law of congress was drawn in question in the court below; and consequently, the question of priority did not arise. That court having decided upon the legal effect of the several acts done by the circuit court of the United States; and, also, upon the legal effect of the election of trustees by the stockholders of the bank, under the act of Maryland: which several acts were relied upon, by the plaintiff in error, as being an assignment of all the property of the bank, or as constituting an act equivalent to such an assignment; the question, whether the bank is a *person*, within the meaning of the act of congress, was necessarily decided. It lies at the foundation of the whole proceeding; and if we now decide, that the bank is not a *person*, within the meaning of the act, under the 25th section of the judiciary act of 1789, it will be our duty to dismiss the writ of error for want of jurisdiction. Inglis v. Coolidge, 2 Wheat. 363; Miller v. Nicholls, 4 Wheat. 311; Crowell v. Randell, and Shoemaker v. Randell, 10 Peters' Rep. 368: M'Kinney et al. v. Carroll, decided at the present term of this Court. We must, therefore, inquire whether the bank is a *person*, within the meaning of the act of congress.

All debtors to the United States, whatever their character, and by whatever mode bound, may be fairly included within the language used in the fifth section of the act of congress. And it is manifest, that congress intended to give priority of payment to the United States over all other creditors, in the cases stated therein. It therefore lies upon those who claim exemption from the operation of the statute, to show that they are not within its provisions. No authority has been adduced to show, that a corporation may not, in the construction of statutes, be regarded as a natural person: while, on the contrary, authorities have been cited which show, that corporations are to be deemed and considered as *persons*, when the circumstances in which they are placed, are identical with those of natural persons, expressly included in such statutes. As this statute has reference to the public good, it ought to be liberally construed. United States v. The State Bank of North Carolina, 6 Peters' Rep. 29. As this question has been fully decided by this Court, other authorities need not be cited.

In the case of the United States v. Amedy, 11 Wheat. 392, which was a prosecution for destroying a vessel at sea with intent to prejudice the underwriters, The Boston Insurance Company; the section of the statute under which he was prosecuted, subjected to the penalty of death any person, being owner, or part owner, who should burn, destroy &c., any ship or vessel, with intent to prejudice any person or persons, that had underwritten, or should underwrite any policy of insurance, &c. The Court, in delivering the opinion, says: "Another question, not raised in the court below, has been raised here, and upon which, as it is vital to the prosecution, we feel ourselves called upon to express an opinion. It is, that a corporation is not a person within the meaning of the act of congress. If there had been any settled course of decisions on this subject, in criminal cases, we should certainly, in a prosecution of this nature, yield to such a construction of the act. But there is no such course of decision. The mischief, intended to be reached by the statute, is the same whether it respects *private* or *corporate* persons." After citing 2 Inst. 736, and some other authorities, the opinion proceeds thus: "Finding, therefore, no authority at common law which overthrows the doctrine of Lord Coke, we do not think that we are entitled to engraft any such constructive exception upon the text of the statute." This case, we think, is decisive of the question. And the fact, that the Elkton Bank cannot be brought within all the predicaments stated in the statute, proves nothing; if it can be brought within any one or more of them.

The record in this case abundantly proves, that a bank may become largely indebted to the United States, and not have property sufficient to pay all its debts. If to these facts were superadded the fact of a voluntary assignment by the bank, of all its property, in any mode authorized by law; the right of the United States to priority would be clearly established.

This brings us to the consideration of the second point raised by the plaintiff in error. The agreed case shows that the attachment fieri facias, upon the judgment of the defendant in error, against the Elkton Bank, issued on the 24th day of September, 1830; and attached in the hands of the plaintiff in error the sum in controversy. The attachment in favour of the United States did not issue until the 8th day of July, 1831. And the plaintiff in error, in answering the interrogatories propounded to him in that proceeding, stated, that in October, in the year 1830, an attachment, at the suit of the Farmers'

Bank of Delaware, against him, as garnishee of the Elkton Bank of Maryland, was served on him, returnable to Cecil county court, where said attachment was still depending. The money thus attached in the hands of the plaintiff in error, by legal process, before the issuing of the attachment in behalf of the United States, was bound for the debt for which it was legally attached, by a writ, which is in the nature of an execution; and the right of a private creditor, thus acquired, could not be defeated by the process subsequently issued on the part of the United States. Prince v. Bartlett, 8 Cranch, 431.

We are next to inquire into the legal effect of the appointment of receivers by the circuit court. Without deciding whether a circuit court of the United States has authority, in a case like this, to appoint receivers, with power to take possession of all the property of a debtor of the United States; it is sufficient to say, in this case, that it does not appear that the power conferred on the receivers was ever executed: and if it had been, it would not have been a transfer and possession of the property of the Elkton Bank, within the meaning of the act of congress: and, therefore, the priority could not have attached to the funds in their hands.

The only remaining question is, whether the election of trustees, by the stockholders of the Elkton Bank, under the statute of Maryland, was such an assignment of all the property of the bank, as would entitle the United States to priority of payment out of its funds. In the investigation of this branch of the subject, it is not necessary to inquire into the regularity of the election of the trustees. Suppose it to have been perfectly regular, in all respects, did it so operate as to divest the Elkton Bank of its property? No one can be divested of his property, by any mode of conveyance, statutory or otherwise, unless at the same time, and by the same conveyance, the grantee becomes invested with the title. As the trustees refused to accept the trust, none was created; and the election thereby became inoperative and void, and the property remained in the bank. Brent v. The Bank of Washington, 10 Peters' R. 611; Hunter v. The United States, 5 Peters' R. 173.

The moment the transfer of property takes place, under the statute, the person taking it, whether by voluntary assignment or by operation of law, becomes bound to the United States for the faithful performance of the trust. Conard v. The Atlantic Insurance Company, 1 Peters' R. 439. As the title to the property of the bank did not pass to the trustees by virtue of the election, there was no fund

to which the priority of the United States could attach; there was no one authorized or bound to execute a trust under the statute: therefore, no legal bar was opposed to the right of recovery and satisfaction of the debt due by the Elkton Bank to the defendant in error.

Upon the whole, it is the opinion of the Court, there is no error in the judgment of the court of appeals.

Mr. Justice STORY, dissenting.

I dissent from so much of the opinion delivered by the Court in this case, as decides that a corporation is a person within the sense of the 5th section of the act of 1797, ch. 74. I have no doubt, whatsoever, that in a legal and technical sense, a corporation is a person; and that under that denomination, it may be included within the provisions of a statute, where the language and provisions and objects of the statute equally apply to corporations and to private persons. My dissent is founded upon this ground, that neither the language nor the provisions of the 5th section of the act of 1797, ch. 74, are applicable to the case of corporations: but that they apply exclusively to private persons; and cannot, without violence to the words and the objects of that act, be strained so as to reach corporations. I think that the persons intended by the act, are such persons only as may be brought within each of the predicaments stated in the act.

The language of the 5th section is, "That where any revenue officer, or other person hereafter becoming indebted to the United States, by bond or otherwise, shall become insolvent, or where the estate of any deceased person, in the hands of executors or administrators, shall be insufficient to pay all the debts due from the deceased, the debt due to the United States shall be first satisfied: and the priority hereby established, shall be deemed to extend as well to cases in which a debtor, not having sufficient property to pay all his debts, shall make a voluntary assignment thereof, or in which the effects of an absconding, concealed or absent debtor, shall be attached by process of law, as to cases in which an act of legal bankruptcy shall be committed."

Now, the statute, manifestly, in this provision, contemplates two classes of cases; insolvency inter vivos; and insolvency upon the death of a debtor. It is plain that the last class cannot have been intended to include corporations; for if it were to be supposed that they could be "deceased debtors," yet by no reasonable use of language, can it be said that they can have executors or administrators,

or estate in the hands of executors or administrators. The other class of cases, is of insolvency inter vivos. Which are these? First, cases in which a debtor not having sufficient property to pay all his debts, shall make a voluntary assignment thereof; that is, of all his property. It certainly is practicable for a corporation to be in this predicament; if by its charter and constitution it is capable of making such a general assignment. But I must say, that independent of some special and positive law; or provision in its charter to such an effect, I do exceedingly doubt, if any corporation, at least without the express assent of all the corporators, can rightfully dispose of all its property by such a general assignment, so as to render itself incapable in future of performing any of its corporate functions. That would be to say, that a majority of a corporation had a right to extinguish the corporation, by its own will, and at its own pleasure. I doubt that right; at least, unless under very special circumstances. Secondly, cases of an absconding, concealed or absent debtor. Now, it is plain, that in no just sense can a corporation be brought within the terms of this predicament. Thirdly, cases of legal bankruptcy. Such cases do not exist in relation to corporations. The general bankrupt laws of England have never been held to extend to corporations; neither have the general insolvent laws of the several states in this Union, where they exist, ever been extended to corporations. Now, my argument is this, and I wish to put it into the most precise and concise form; that the fifth section of the act of 1797, ch. 74, was never intended to apply to any debtors or persons who were not, and might not be within every one of the classes of predicaments above stated. Corporations cannot be within three out of the four predicaments above stated; and therefore I hold, that the legislature never could have intended to embrace them within the provisions of the section.

I dissent from the opinion upon this point, upon another and independent ground; and that is, that the opinion is wholly extrajudicial, and unauthorized by law. That the question was not made or decided in the court below; and that unless it was so made and decided, it cannot be re-examined in this Court. This is a writ of error, not to a circuit court of the United States, but to the highest court of a state; and brought here for our revision, under the 25th section of the judiciary act of 1789, ch. 20. That section expressly declares, that upon such a writ of error "no other error shall be assigned, or regarded as a ground of reversal in any such case as aforesaid, than such as appears on the face of the record, and immediately

[Beaston v. The Farmers' Bank of Delaware.]

respects the beforementioned questions of the validity or construction of the said constitution, treaties, statutes, commissions or authorities in dispute." The preceding part of the same section, authorizes the writ of error only when the decision of the state court has been against the validity or construction of the constitution, treaties, statutes, commissions or authorities stated in the section. So that it is manifest, and so has been the uniform course of this Court, that no question not made in the court below, on which its judgment ultimately turned, can be made, or is re-examinable here. I have already said, that it is apparent upon this record, that no such point arose, or decision was made in the court of appeals of Maryland; and, therefore, I cannot but consider the decision here pronounced upon it, as coram non judice; and in no just sense, obligatory upon us, or upon our successors.

I know that my brother, Mr. Justice BARBOUR, held the same opinion as I do, on this question. His departure from the Court before the opinion in this case was pronounced, does not entitle me to speak further in his behalf.

Mr. Justice BALDWIN concurred with Mr. Justice STORY in the opinion delivered by him ; and with the majority of the Court, in affirming the judgment of the court of appeals.

Mr. Justice M'LEAN concurred with Mr. Justice STORY.

This cause came on to be heard, on the transcript of the record from the court of appeals for the Eastern Shore of Maryland, and was argued by counsel. On consideration whereof, it is now here adjudged, and ordered by this Court, that the judgment of the said court of appeals in this cause be, and the same is hereby affirmed, with costs.