COMMONWEALTH *vs.* PRESIDENT, DIRECTORS, &c. OF THE PHŒNIX BANK.

In adjusting the concerns of a bank, by receivers of its assets appointed pursuant to the provisions of *St.* 1838, *c.* 14, the bank tax imposed by Rev. Sts. *c.* 9, § 1, and *c.* 36, § 45, and due from the bank, may be set off against money due from the Commonwealth to the bank on loan: So of money deposited in the bank by the agent of Charles River Bridge, in his capacity as such agent under *Sts.* 1841, *c.* 88, and 1843, *c.* 30: *Aliter,* of money deposited in the bank by the warden of the state prison, in his capacity of warden.

An incorporated bank is not a person, within the meaning of the act of congress (*St.* 1797, *c.* 74, § 5) which requires priority of payment to be made to the United States, when any person indebted to them shall become insolvent, not having sufficient property to pay all his debts or shall make a voluntary assignment of his property, or when his property shall be attached by process against an absconding, concealed or absent debtor, or when a legal act of bankruptcy shall be committed by him.

When the assets of a bank are put into the hands of receivers, pursuant to *St.* 1838, *c.* 14, to have its concerns adjusted according to the provisions of Rev. Sts. *c.* 44, the United States, if creditors of the bank, are not entitled to priority of payment, under the act of congress of 1797, *c.* 74, § 5; there not being, in that case, such an insolvency of their debtor as is contemplated by that act.

THIS was a process, instituted by the bank commissioners, under *St.* 1838, *c.* 14, § 5. An injunction was issued, restraining the Phœnix Bank from further proceeding with its business; receivers were appointed to take possession of its property and effects; and its charter was repealed by *St.* 1845, *c.* 106, which enacted that the receivers already appointed should have the same powers, in all respects, as though they had been appointed under the provisions of the Rev. Sts. *c.* 44.

At the last November term, the receivers presented to the court a representation and petition, in substance as follows: That there was among the assets of the bank, a certificate, signed by the treasurer of the Commonwealth, for the sum of $6000, being the amount of a loan for that sum, made by the bank to the Commonwealth, payable with interest at five per cent. per annum, according to authority vested in the treasurer by a resolve of the legislature, passed on the 3d of March 1842: That by virtue of the Rev. Sts. *c.* 9, § 1, and *c.* 36, § 45, there became due and payable from the bank to the Commonwealth, on the 13th of October 1842, the sum of $1500, viz. a tax of one half of one per cent. on $300,000, the capital of the bank actually paid in by the stockholders, for which sum of $1500 the said treasurer had presented a claim to the receivers for allowance, who allowed the same, and issued and delivered to said treasurer a certificate of the allowance thereof: That, at the time when the bank stopped payment and the injunction was issued against it, in this case, there was in the bank, of moneys that had been deposited therein by C. Lincoln, jr. warden of the state prison, the sum of $11,900·30, which sum, on the books of the bank, stood credited to the account of said Lincoln, headed and entitled " Charles Lincoln, jr. Warden of Massachusetts State Prison at Charlestown; " and also of moneys which had been deposited therein by Ebenezer Barker, agent of the Charles River Bridge, the sum of $9184·42, which sum, on the books of the bank, stood credited to the account of said Barker, headed and entitled, " Ebenezer Barker, agent: " That said Lincoln and Barker severally demanded of the receivers to have the amounts, so standing to their credit, allowed to them as claims against the assets of the bank; and that the receivers had allowed said claims, and issued and delivered to them, respectively, certificates of the allowance thereof: That the receivers, pursuant to an order of this court, passed on the 21st of April 1843, returned to this court a report of all claims which had been presented to them for allowance, and in which report they set forth the three several claims above mentioned; that

due notice of the filing of said report was given, pursuant to an order of the court; and that a decretal order of the court afterwards passed by the court, confirming said report in regard to all the said claims: That a dividend of fifty per cent. having been ordered on the amount of said claims, Frederick Robinson, then being warden of the state prison, presented the certificate, issued as aforesaid to said Lincoln, and demanded and received the said dividend on the claim so presented and allowed in the name of said Lincoln, warden; and the said Barker presented the certificate, issued as aforesaid to him, and demanded and received the said dividend on the claim which had been so presented and allowed in his name; for which said payments said Robinson and Barker indorsed receipts on said certificates, and on the records of said certificates in the receivers' hands: That after the payment of said dividends, the receivers presented to the treasurer of the Commonwealth his certificate for the aforesaid sum of $6000, and requested him to pay the amount thereof, with interest, deducting the amount of the bank tax aforesaid; but that he refused to make such payment, and claimed that the amount of said bank tax, the amount allowed, as aforesaid, to Charles Lincoln, jr. warden, and the amount allowed to Ebenezer Barker, agent, should be consolidated and allowed as one claim due to the Commonwealth, and that the amount of said certificate of $6000 should be set off and deducted from such consolidated amount, and a dividend be paid to the Commonwealth on the balance which should remain unsatisfied by such set-off; but that the said Robinson and Barker severally refused to accede to such an arrangement, or to refund any part of the dividend which had been received by them: That in order to enable the receivers to effect a settlement of said claims, the legislature, on the 20th of February 1845, passed the following resolve: "Resolved, that the Commonwealth's attorney for the county of Suffolk be, and he is hereby required to appear before the supreme judicial court, in behalf of the Commonwealth, in the case of the Commonwealth by Bank Commissioners *versus* the

President, Director sand Company of the Phœnix Bank, upon the hearing of any question which may arise in said case, concerning the mutual claims between the Commonwealth and the said corporation ; and the treasurer of the Commonwealth is hereby authorized to adjust and settle such claims, in conformity with the judgment of the court in the premises : and if, by such judgment, any balance shall be found due from the Commonwealth to the said corporation, the governor is hereby authorized to draw his warrant for the payment of the same to the receivers appointed by said court in the aforenamed case."

The receivers therefore prayed that a hearing might be had in regard to the questions that had arisen concerning the aforesaid claims, to the end that a judgment might be rendered in the premises, and that an adjustment and settlement of said claims might be had conformably to such judgment.

Notice of the foregoing petition was served on the 2d cf December 1845, and Samuel D. Parker, Esq. attorney of the Commonwealth for the county of Suffolk, afterwards appeared in behalf of the Commonwealth. At the present term, the abovenamed Frederick Robinson, warden of the state prison, and Ebenezer Barker, agent of Charles River Bridge, filed their written consent that the court should make a decree without reference to either of them in their official capacity.

*W. J. Hubbard*, for the defendants. In *Peirce* v. *City of Boston*, 3 Met. 520, it was decided that a tax, being neither a judgment nor a contract, was not the subject of set-off under the Rev. Sts. *c.* 96. And by that chapter, only matters, which are themselves the subject of set-off, can be met by set-off. The bank could not set off the loan against the tax, because the loan is payable at pleasure, and not at a given day. It seems to follow that the tax cannot be set off against the loan. And this is an answer to the suggestion which may be made, that a bank tax is a contract, because the bank accepted a charter which requires payment of a semi-annual tax, and therefore differs from the tax which was held not to be a contract. in the case of *Peirce* v. *City of Boston.*

Barker's claim is not a subject of set-off by the Common-wealth. *Non constat* that he was authorized by the Commonwealth to make the deposit. Though he deposited as agent, yet he did it personally. The character of his agency does not warrant a set-off. He is agent of Charles River Bridge under the provisions of *St.* 1841, *c.* 88; that is, he was an agent appointed by the executive to repair that bridge, in a manner prescribed by commissioners, and to appoint persons to collect tolls, &c. ; and he was to render a quarterly account to the governor and council of the receipts of toll, and all other receipts on account of the bridge, and of all expenditures thereon, and to pay the balance in his hands, quarterly, to the treasurer of the Commonwealth. Though his agency was created by a law of the Commonwealth and he is accountable to its officers, yet the Commonwealth has no interest in the money received by him as public money, in which the whole State has an interest.

The claim of the warden of the state prison stands on grounds that are similar, and even stronger. By Rev. Sts. *c.* 144, that officer is a sole corporation. He is not agent of the Commonwealth. Contracts must be made and suits brought in his name. The money that goes into his hands is under his control. The bank could not set off his debt against a claim of the Commonwealth. He has a right to keep his hold on money in his possession, for his salary, and for claims on him upon contracts which he is obliged to make, and for which he is personally responsible.

*S. D. Parker,* for the Commonwealth. The money deposited in the bank by the warden and bridge agent was not theirs, but the money of the Commonwealth. They were trustees, and the Commonwealth *cestui que trust.* And the bank had express notice that it was so, by the heading of their accounts with the bank, and by the public statutes, of which all persons and corporations have notice. By *Sts.* 1841, *c.* 88, and 1843, *c.* 30, the bridge agent was to pay to the state treasurer, quarterly, the balance of all receipts by him over the expenditures made by him. This shows that he was a

mere bailee or disbursing officer. So of the warden of the state prison. See *Bradford* v. *Rowe*, 3 Pick. 17. *Austin* v. *Foster*, 9 Pick. 341. Hence a set-off is allowable under Rev. Sts. *c.* 96, §§ 11–14, and *c.* 90, § 50. But these statute provisions are not alone to be regarded, in a court of equity, in an equity process like this. *Simson* v. *Hart*, 14 Johns. 63. *Van Beuren* v. *Van Gaasbeck*, 4 Cow. 496. *Duncan* v. *Lyon*, 3 Johns. Ch. 358. *M'Donald* v. *Neilson*, 2 Cow. 139.

Set-off is not restricted to the parties on the record. *Barrett* v. *Barrett*, 8 Pick. 342. *McNutt* v. *Bland*, 2 Howard, 9. *Bank of Niagara* v. *Rosevelt*, 9 Cow. 409. *Matter of the Receiver*, 9 Cow. 414, *note. Chesterfield Manuf. Co.* v. *Dehon*, and *Lazarus* v. *Commonwealth Ins. Co.* 5 Pick. 9, 76. *Mason* v. *Waite*, 17 Mass. 560. *Beckwith* v. *Sibley*, 11 Pick. 484. *Denston* v. *Perkins*, 2 Pick. 86. *Thompson* v. *Perkins*, 3 Mason, 232. *Kelly* v. *Bowman*, 12 Pick. 387. *Farrow* v. *Commonwealth Ins. Co.* 18 Pick. 53. *Hallowell and Augusta Bank* v. *Howard*, 13 Mass. 235. *Girard* v. *Taggart*, 5 S. & R. 27. *Price* v. *Ralston*, 2 Dall. 67. *Winch* v. *Keeley*, 1 T. R. 619. *Hurlbert* v. *Pacific Ins. Co.* 2 Sumner, 471. These cases show that the Commonwealth might have sued the bank for the money deposited by the warden and bridge agent, subject to the equitable lien of the bank. The money would not go to the representatives of the warden and agent on their decease. The person for whose use a trust is created, who is to be the ultimate receiver of money, may sustain a suit in equity to have it paid directly to himself. Per Marshall, C. J. 7 Cranch, 97.

SHAW, C. J. At the time of the proceedings for appointing receivers of the Phœnix Bank, the Commonwealth were indebted to that bank for money borrowed under authority of law, in the sum of $6000. On a call by the receivers for this amount, as part of the assets of the bank, the Commonwealth object, and claim that, either by law or upon principles of equity, they are entitled to set off demands held by them, or for their use, against the bank; and they claim that the balance only is the true debt, on either side.

1. The first claim was the bank tax due a few days after the injunction issued, being $1500 for one half of one per cent. on the capital, according to the Rev. Sts. *c.* 9, § 1, and *c.* 36, § 45.

At first, the receivers were willing to allow this deduction, if the Commonwealth would pay the balance, but this the treasurer did not feel authorized to do, and the offer, therefore, was not acted upon. The receivers now, in behalf of the general interest, object, on the ground that a tax is not a set-off against a loan, on the authority of the case of *Peirce* v. *City of Boston*, 3 Met. 520. But we think the authority is not applicable. That was a suit against the city for the salary of a schoolmaster, which, it appeared, had been assigned and was sued for the benefit of an assignee; and the attempt of the defendants was to set off a tax which had been assessed upon the assignee and another person. It was decided on the ground that it was neither a debt due by contract nor by judgment, and therefore was not within the provisions of the statute there relied upon. But we think a bank tax due the Commonwealth stands on a different footing. Though called a tax, it is rather in the nature of an annuity or bonus, which the bank, by their acceptance of the charter, agree to pay, as a compensation for the franchise obtained by it. It is, therefore, a debt due by contract, and, as such, comes within the principle of set-off.

2. The next claim is for money deposited by Ebenezer Barker, the agent of the Commonwealth for Charles River Bridge. It appears that the money was deposited by him, and entered to his credit in the books, in his capacity as agent; and the act under which he was appointed, the *St.* of 1841, *c.* 88, shows what was the nature of such agency. The money in his hands was either money advanced from the treasury of the Commonwealth, for the purpose of making repairs of Charles River Bridge, or money received for tolls, which toll was due to the Commonwealth. The whole of the money which could come into his hands was the money of the Commonwealth, or money received to the use of the

Commonwealth, and for which he was accountable.  He was required by the act under which he was appointed to account quarterly and to pay over to the treasurer the balance of his quarterly accounts.  Can the money deposited by such agent be relied upon by the Commonwealth as a set-off against the money due from them to the bank ?

The right of set-off, founded originally in considerations of equity, is somewhat enlarged by the revised statutes, and extended beyond the limits formerly prescribed to it.  Several provisions of those statutes recognize the right to extend the principle of set-off to equitable demands.  When, in an action at law, the defendant has an equitable demand against the plaintiff — for instance, the assignment of a chose in action — upon which he could not maintain an action, yet he shall have the privilege of setting it off.  Rev. Sts. c. 96, § 5.  So, on the contrary, by § 11, if an action be brought by one as trustee, or for the use and benefit of another, the defendant may set off any demand he has against the person for whose use the action is brought.  These provisions establish the principle that in a set-off, even in an action at law, the court will recognize equitable demands upon which an action at law would not lie in the name of the party beneficially interested ; and that it is not confined to legal demands between the parties to the action.

It is true that these principles do not apply precisely to the present case, because this is not an action at law ; but it is a proceeding in the nature of an action or of many actions, in which it becomes necessary to decide between parties, debtor and creditor, as if they were sole parties to an action for the recovery of a debt, and are therefore within the equity of the statute.

Upon the provisions of the act constituting the agency for Charles River Bridge, it appears to us, that the person thus appointed was the mere agent of the Commonwealth ; that the moneys collected, though in such sense his moneys, until accounted for and paid over, that such payment out of the same by him could not be questioned by the Commonwealth, yet that the moneys were collected and held for the use and

benefit of the Commonwealth, to be paid into the treasury. Then if he placed the money temporarily in the bank to lie, if not necessarily drawn out to be applied to the purposes for which he was appointed, during the intervals of time designated by law for payment of the same into the treasury, and did this in a form indicating that he was acting in behalf of some other person, it is now competent to show, by evidence *aliunde,* that it was intended for the security and benefit of the Commonwealth, and thus to show that the Commonwealth had an equitable interest in it.

Without deciding, therefore, whether upon notice to the bank the Commonwealth could have brought an action in their own name, we are of opinion, that they so far had an equitable interest, and stood in the relation of principal, that they may set off such demand in part satisfaction of the demand of the bank against them, provided that the agent had not such lien or other equitable claim on the funds in his hands, as to defeat this claim. It appears by the certificate of the agent filed in the case, that he has no claim upon the fund ; that he is willing that the amount be set off against the demand of the bank upon the Commonwealth. The case then, we think, is brought not only within the principle of equity, that in all final adjustments between debtor and creditor, the actual balance, after setting off all demands against each other, is the true debt, but also within the spirit and equity of the provisions of the revised statutes, which, in the application of the rules of set-off, put equitable claims upon the footing of legal debts.

3. Can the deposit made by the warden of the state prison be set off? His authority and duty are regulated by the Rev. Sts. *c.* 144, §§ 16–19.

This demand stands upon a very different ground from that of the bridge agent ; a difference depending upon the very different provisions of law under which these agents are constituted.

By the revised statutes, the state prison and its officers are constituted a separate and distinct establishment, having

12 *

powers and functions, and being charged with duties and re-
sponsibilities, of a peculiar nature.   It is provided that the
warden shall have the charge and custody of all the real and
personal estate, stock, tools and property pertaining to the
prison ; that he shall be treasurer of the prison ; that he shall
receive and pay out all moneys granted by the legislature for
the support thereof, and shall keep and render regular ac-
counts.   It is provided, *c.* 144, § 19, that all contracts on
account of the prison shall be made by the warden ; that the
warden and his successor may sue or be sued thereon to final
judgment and execution ; that no such suit shall abate by
reason of the office of warden becoming vacant ; but that any
successor of the warden, pending such suit, may take upon
himself the prosecution or defence thereof ; and that, upon
motion of the adverse party and notice, he shall be required
to do so.   These provisions are copied exactly from those of
*St.* 1827, *c.* 118.

The court are of opinion that in no sense can the money
thus received and held by the warden of the state prison, in
his official capacity, be regarded as the money of the Com-
monwealth, or held in trust for the Commonwealth, or money
in which the Commonwealth has any equitable interest.   The
warden is liable to judgment and execution.   Both the obli-
gations of the warden and the property to meet them devolve
on his successor.   The Commonwealth have an interest to
sustain this establishment as a public institution, maintained
for the general benefit, in aid of the administration of its crim-
inal jurisprudence.   The statute contemplates that the Com-
monwealth may have occasion to appropriate money, from time
to time, should the revenues of the prison be insufficient for
its support.   But to the extent of those revenues they are
placed entirely under the control of the warden, he being sub-
ject only to apply them to the purposes of the institution, and
to render his account of the manner of their disbursement.
And we think that it was the intention of the legislature to
put the warden in such a situation of responsibility for all
contracts made on account of the prison, that persons dealing

with him, and making contracts, should not be barred of their legal remedies by being obliged to treat such contracts as made with the Commonwealth, who are not liable in their sovereign capacity to be sued. The law provides in effect, that all persons dealing with the warden shall be placed, for all purposes of legal right and remedy, in the same condition as if dealing with an individual person. Perhaps the legal condition in which the warden is thus placed bears the nearest analogy to that of a corporation sole. He holds the property and makes himself liable to suits, for the time being, *qua* owner; but the property, obligations and duties, on his ceasing to hold the office, devolve on his successor, and not on his personal representative.

The case of *Bradford* v. *Rowe*, 3 Pick. 17, cited by the counsel for the Commonwealth, decided, it is true, that the successor of a deceased warden was not bound to come in and prosecute a suit commenced by his predecessor. But that case depended on *St.* 1813, *c.* 47, § 1, which authorized the warden to prosecute suits on contracts, but did not render him liable to be sued on any such contracts; and in that respect varies entirely from the existing law, and is no authority for the present case. The case of *Austin* v. *Foster*, 9 Pick. 341, was decided after the passage of *St.* 1827, above cited, and it decided that the warden was liable to contracts made on account of the prison; and it was held that, by force of the statute, this extended to express contracts, and to oral contracts as well as those in writing.

We are therefore of opinion, that the money deposited by the warden of the state prison cannot be set off against the demand of the bank upon the Commonwealth.

---

The United States made a claim on the defendants for money deposited by pursers in the navy and a recruiting officer, and also claimed a right of priority of payment. This claim was referred to a master in chancery, at the last November term, with directions that he should "report all facts necessary for a final decree upon the said claim." The master's report was in substance as follows ·

Commonwealth *v.* Phœnix Bank.

The Phœnix Bank stopped payment on the 3d of October 1842, at which time the following balances of credits stood on the books of said bank, viz. :

| | |
|---|---|
| To the credit of " Joseph Wilson, Purser, N. Yard," | $18,930·01 |
| " Thomas M. Taylor, Purser," | 12,616·23 |
| " Francis M. Stockton, Purser," | 150·00 |
| " John B. Montgomery, Recruiting Officer," | 689·95 |
| " Edward N. Cox, Purser," | 2573·68 |

The receivers in this case entered into an arrangement with the said Wilson and Taylor, and with the District Attorney of the United States, to the following effect : That the holders of sundry checks, which had been drawn on the bank by said Wilson and Taylor in their official capacities, before said 3d of October, should be allowed to prove said checks as claims against the assets of the bank in the hands of the receivers, and that the claims for the aforesaid balances, in whosesoever favor the same might be finally allowed, should be reduced by the amount of the checks which should be so proved. Under this arrangement, checks so drawn by said Wilson have been presented to and allowed by the receivers, amounting in all to $1329·98, thereby reducing the amount standing to his credit to the sum of $17,600·03 ; and checks drawn by said Taylor have been presented and allowed by the receivers, to the amount of $92·64, thereby reducing the amount standing to his credit to the sum of $12,523·58.

Another arrangement was subsequently made, by which a dividend of fifty per cent. was paid to all the officers above named, on the amount of their respective claims; such dividend being paid on the balance of the accounts of said Wilson and Taylor, reduced as aforesaid, so that the amount now remaining unpaid is as follows :

| | |
|---|---|
| Joseph Wilson, Purser, | $8900·02 |
| Thomas M. Taylor, Purser, | 6261·79 |
| Francis M. Stockton, Purser, | 75·00 |
| John B. Montgomery, Recruiting Officer, | 344·98 |
| Edward N. Cox, Purser, | 1286·84 |

The abovenamed persons were depositors in said bank, and all of them officers in the naval service of the United States

They received public moneys from the navy agent, either in treasury notes or checks on the Merchants' Bank in Boston. Their business was transacted chiefly at the navy yard at Charlestown, and it was convenient for them to make deposits in, and draw money from, the Phœnix Bank in that town. This bank, before the sub-treasury system went into operation, was one of the deposit banks of the government; but the abovenamed officers were not directed by the government to make deposits in that or any other bank. The treasury notes paid by the navy agent were at a small discount in the market, but were received in deposit, at their par value, by the Phœnix Bank, with an understanding, on the part of the depositors, that checks were not immediately to be drawn against the deposits, unless the public service required it.

The payments made by the navy agent to the abovenamed officers corresponded, substantially, in dates and amounts, with their deposits in the bank.

The treasury notes, deposited as above mentioned, bore interest from the time they were issued by the navy agent, and not from their date. They were taken at their par value by the bank, and the interest which had accrued on them was credited to the depositors. The arrangements relating to these deposits were made by the depositors, and not by the government; and it was not known to the president of the bank that the government was conusant of any such arrangements. The bank did not give notice to the government of the said deposits, nor did the government give notice to the bank, before October 3d 1842, that it should hold the bank answerable for the deposits.

The checks drawn by the abovenamed officers on the bank were signed by them in their official names.

The said Wilson, on the 23d of February 1842, wrote a letter to Mr. Upshur, secretary of the navy, stating that he had received from the navy agent $30,852·50, in treasury notes, bearing interest from that day, to pay the amounts that would be due to the officers, seamen, &c.; that he could not

dispose of them on better terms than at half per cent. discount, &c. and asking the secretary to furnish him with instructions how to dispose of said notes, that he might be enabled to pay the several rolls, as they should become due. To this letter the secretary replied, on the 2d of March 1842, that he had no authority to dispose of treasury notes at less than par ; that he must rely on the efforts of the disbursing officers of the department tó make such arrangements as might be practicable in the discharge of their duties, but that he could pay only what he received.

*B. R. Curtis*, for the United States. By the act of congress passed March 3d 1797, (*St.* 1797, *c.* 74, § 5,) a debt due to the United States from any revenue officer or other person, who shall become insolvent, shall be first satisfied, when the debtor's property is insufficient to pay all his debts ; and this priority extends to cases of voluntary assignment by a debtor, to cases of attachment of the effects of an absconding, concealed or absent debtor, and to cases in which the debtor commits an act of legal bankruptcy. And this statute provision is to receive a fair and reasonable interpretation, according to the just import of its terms. Per Story J. 6 Pet. 35.

1. Is here "a debt due to the United States"? The money deposited in the bank was the public money ; and a purser is by law a receiver and disburser of the public money. *U. States* v. *Tingey*, 5 Pet. 126, 127. The deposits were made in the names of the pursers and recruiting officer, as such ; and the lawful effect and inference are, that they deposited the money as public money. *Dugan* v. *U. States*, 3 Wheat. 180.

Does the contract arising from the deposits enure to the benefit of the United States? This is a proceeding in equity, and therefore, even if the depositors must have sued in their own names, in an action at law, yet the *cestui que trust* may come in, in this suit. But the money was legally that of the United States. Public agents, acting for the government, do not bind themselves, but the government. *Hodgson* v. *Dex-*

*ter,* 1 Cranch, 345. Of course, as the government is bound by the contracts made by its agents, it is entitled to the money deposited by them, and may sue for it, if the depositary refuse to pay it. 3 Wheat. *ubi sup.* *U. States* v. *Buford,* 3 Pet. 12. *Bainbridge* v. *Downie,* 6 Mass. 253. And so it would be, if the transaction were by an agent of a private corporation. *Gilmore* v. *Pope,* 5 Mass. 491. *Taunton, &c. Turnpike* v. *Whiting,* 10 Mass. 327. *Inhabitants of Garland* v. *Reynolds,* 2 Appleton, 45. And so it is in case of private individuals. Story on Agency, § 418.

2. A corporation is a "person," within the meaning of *St.* 1797, *c.* 74, § 5. Rev. Sts. *c.* 2, § 6. 1 Bl. Com. 123. *The People* v. *Utica Ins. Co.* 15 Johns. 381, 382. This point was decided in *Beaston* v. *Farmers' Bank of Delaware,* 12 Pet. 102, and that decision, though by a divided court, is binding on this court.

3. Are the defendants within the predicament of *St.* 1797, *c.* 74, § 5, by having " become insolvent," or by having committed "an act of legal bankruptcy"? When this statute was passed, there was no bankrupt act; so that a technical bankruptcy could not have been intended. And so it has been decided. *U. States* v. *Fisher,* 2 Cranch, 358. *Field* v. *U. States,* 9 Pet. 182. *U. States* v. *Clark,* Paine, 639. *U. States* v. *Hooe,* 3 Cranch, 91. *Theluson* v. *Smith,* 2 Wheat. 424, 425.

The defendants are " insolvent," within the meaning of the statute. They have stopped payment, all their effects are taken from them and put into the hands of receivers, and their charter is repealed. In *Atlas Bank* v. *Nahant Bank,* 23 Pick. 488, Shaw, C. J. says, the statute of the Commonwealth, under which this process is carried on, has reference mainly to insolvent corporations, and is, therefore, in its character, essentially a statute of distribution amongst creditors.

The duties of the receivers, in the case at bar, are such as take the case out of the decision in *Beaston* v. *Farmers' Bank of Delaware,* in which the appointment of a receiver was held not to render a bank insolvent, within the *St.* of 1797,

c. 74. There the receiver was appointed in a chancery suit. It was the act of a particular creditor, to obtain his debt, and not a statute insolvency. The ordinary powers of a common law receiver are very different from those of the receivers appointed in the present case. *Verplanck* v. *Mercantile Ins. Co.* 2 Paige, 438. These receivers are trustees, to hold the defendants' property, subject to the priority of the United States. 12 Pet. 133.

*Choate & W. J. Hubbard,* for the defendants. 1. The United States are not creditors of the bank ; for the bank is not their debtor. Pursers and recruiting officers are not mere depositors. They are accountable to the United States for the moneys which they receive. *St.* of United States, 1817, c. 197. Receivers are not mere bailees, but are charged as debtors on the books of the government, and nothing but payment will exonerate them. *U. States* v. *Prescott,* 3 Howard, 578. *Trafton* v. *U. States,* 3 Story R. 646. The case of *U. States* v. *Buford,* cited on the other side, does not impugn this view of the law. In that case, one officer had paid over to another, and his act, in so doing, had been ratified by the government. In legal effect, he had made payment.

There was no express contract between the United States and these defendants, and the evidence negatives any implied contract. The treasury notes were not deposited as the funds of the United States, but were sold to the defendants by the officers, who were debtors of the United States; and the defendants became debtors to those officers.

2. Corporations are not " persons," within the meaning of *St.* 1797, c. 74, § 5. A contrary opinion was given by a bare majority of the court in *Beaston* v. *Farmers' Bank of Delaware,* 12 Pet. 102. And this court may well revise that opinion, especially as it was an extrajudicial one ; the point not having been adjudged by the court of Maryland, from which the record in that case was brought. *Prima fronte,* the word " persons " means natural persons ; and it is for the United States to show that any corporation is intended. Persons

who may die or abscond are alone mentioned in *Sts.* 1792 and 1797. Depositing in a state bank was unheard of in 1792 and 1797. In 1809, for the first time, deposits were allowed to be made in such banks as the president of the United States might designate. In 1801 and 1816, the bank of the United States was made the depositary of the public moneys. Congress would not have given a priority of claim against a state bank, if the subject had been in their minds. Insolvent laws and bankrupt acts do not extend to banks or other corporations. A priority law is a kind of bankrupt law ; and as the state banks furnished most of the currency, it might have been thought that a priority would do more harm to the people than good to the Union.

3. There is no such " insolvency " of the defendants as entitles the United States to a priority. Insolvency must be manifested in one of the ways mentioned in the statute. In *Sts.* 1789, *c.* 5, § 21, and 1790, *c.* 62, § 45, the words "all cases of insolvency " were used without explanation. The *Sts.* of 1792, *c.* 27, § 18, and 1797, *c.* 74, § 5, declared what insolvency should be, viz. a voluntary assignment, by a debtor, not having sufficient to pay his debts, of his property, for the benefit of his creditors ; the attachment, by process of law, of the estate and effects of an absconding, concealed or absent debtor; and a legal act of bankruptcy. In the case at bar, there is no legal act of bankruptcy, no process against absconding, concealed or absent debtors, nor a voluntary assignment of property. *Non constat* that the defendants will not pay in full. But if it were certain that they would not, yet inability to pay is not enough to give a priority to the United States. The defendants stopped payment. But no law of congress or of the Commonwealth has made that " a legal act of bankruptcy ; " and therefore it cannot be so regarded under the *St.* of 1797, *c.* 74. 1 Cooke's Bankrupt Laws, (8th ed.) 118. The Rev. Sts. *c.* 44, §§ 8 – 10, and *St.* 1838, *c.* 14, § 5, have provided a statute guardianship for banks that proceed illegally, as well as for banks that are insolvent. The proceedings in the present case were

not instituted on the ground of the defendants' insolvency, but on the ground of their violation of law. Priority has never been allowed, under *St.* 1797, *c.* 74, except in cases of assignment by the debtor. No act of bankruptcy · has ever arisen, because there has been no act of legal bankruptcy. It was assumed, in *Beaston* v. *Farmers' Bank of Delaware,* that there must be an assignment. See 3 Cranch, 91, per Marshall, C. J. *Bartlet* v. *Prince,* 9 Mass. 431, and 8 Cranch, 431. *U. States* v. *King,* Wallace, 12. *Conard* v. *Atlantic Ins. Co.* 1 Pet. 439. *Theluson* v. *Smith,* 2 Wheat. 396. *U. States* v. *Howland,* 4 Wheat. 108.

The proceedings in the case of *Atlas Bank* v. *Nahant Bank* were under the Rev. Sts. *c.* 44, which provide that when the charter of a corporation shall expire or be annulled, the court may appoint "receivers or *trustees.*" But the proceedings in the present case are under *St.* 1838, *c.* 14, in which the receivers are not called trustees. And the appointment of receivers does not amount to nor prove an insolvency. In the case cited from 2 Paige, 438, the revised statutes of New York provided that the property should vest in the receivers. See Edwards on Receivers, 83, 225, 241, 383. In *Beaston* v. *Farmers' Bank of Delaware,* the receivers' powers were as full as in the case at bar; yet the case shows that there was not an insolvency.

*C. P. Curtis,* in reply. The case of *Beaston* v. *Farmers' Bank of Delaware* shows that the court of Maryland must have passed upon the question whether corporations were within the *St.* of 1797, *c.* 74; for that court would otherwise have stopped *in limine,* and not have inquired whether the bank was *such a corporation* as came within the statute.

The cases of *Bayly* v. *Schofield,* 1 M. & S. 338, and *Shone* v. *Lucas,* 3 Dowl. & Ryl. 218, show that insolvency, within the meaning of the English bankrupt laws, does not mean inability ultimately to pay in full, but such a condition of the debtor as prevents his paying his debts in the ordinary course of business. And under our insolvent law, (*St.* 1838 *c.* 163,) a debtor's property may be assigned, though he is no

unable to pay ; as for omitting to give security when his property is attached.

The case of *Trafton* v. *U. States,* was assumpsit against a postmaster and his clerk, who deposited money collected for postage, in their joint names, as individuals. The decision, therefore, has no tendency to show that the money now claimed by the United States is not theirs.

In *U. States* v. *Prescott,* the action was on a bond given by a receiver of the public money, and the conditions of the bond were such, that he could not defend on the ground that he was robbed of the money. But it does not appear, in the case at bar, what are the conditions of the bonds given by the depositors, nor that they have given any bonds.

Shaw, C. J. This claim of the United States is for a priority in the payment of debts due for deposits made by pursers and a recruiting officer, in the bank, on the ground that the money thus deposited was the money of the United States ; that the bank was a debtor therefor to the United States ; that the proceedings in this case are in the nature of a legal insolvency, within the meaning of the laws of the United States giving them priority ; and that they are entitled to receive the amount of their debts in full.

Claims to a preference and payment in full are not favored by any considerations of equity. The general rule is, that when several creditors are entitled to payment from a fund insufficient to satisfy the whole, they shall share in proportion. This rule of equity may be controlled by a provision of positive law. In such case all the creditors will not be equally entitled to be paid in full, and equity must yield to the law. But in order to establish such a preference, it must be made plainly to appear that the case is within the rule of law that secures such preference. It is not denied on the part of the receivers, who represent the general creditors in the present case, that it is competent for the government of the United States to provide, that debts due to them, or to their officers for their use, shall have priority in certain cases ; but they deny that the national legislature have so provided.

and insist that the case is not within the class of cases in which such preference is given by law.

Three questions are made in the present case. 1st. Whether the deposits by these public officers constituted the bank a debtor to the United States, within the true meaning of the law of the United States providing for a payment of the debts in full, in certain cases of insolvency.    2d. Whether the Phœnix Bank was such a debtor to the United States as is contemplated by the law.    3d. Whether these proceedings, in the case of the Phœnix Bank, constitute such a legal bankruptcy or insolvency, or otherwise place the bank in such a condition, as to give effect to the law of the United States securing such priority, on insolvency.

1. Considering this to be a question of strict law, it is very questionable whether the deposits made by these pursers, in their own names, though designating the capacity in which they act, make the bank debtor to the United States.  Their officers are intrusted with the money to keep in their own custody, or deposit as they please; and they are made absolute debtors to the United States, to account for it, and see it forthcoming, and they are not discharged even by a loss by theft, without any fault of their own.    *U. States* v. *Prescott*, 3 Howard, 578.  In the case of *Trafton* v. *U. States*, recently decided in the circuit court, [since published in 3 Story R. 646,] Mr. Justice Story expressed a strong opinion that money received by a postmaster for postage was not public money, but the money of the postmaster himself, to be accounted for in settlement.  It does not appear that pursers were required by law, or by any regulation of the navy department, to deposit the money received by them in any bank, or in the name of the government; but they were left to adopt such course, in this respect, as they considered best. The letter of Mr. Upshur, whilst secretary of the navy, was rather in regard to the exchange of treasury notes, than as to deposits, and, in answer to Purser Wilson's proposal, left him to adopt such arrangement as he thought fit, so that he accounted for he treasury notes at par.  But whether the

United States, by giving notice to the bank, on the failure or death of one of their officers, not to pay over money thus deposited, could have established a legal or equitable claim to have the money paid to them, we have not found it necessary to give any opinion.

2. But suppose this first question settled in favor of the United States, the next material question is, whether the defendant corporation, the Phœnix Bank, was such a debtor as to come within the acts giving the United States a priority. These acts are *Sts.* 1789, *c. 5,* § 21 ; 1790, *c.* 62, § 45 ; 1792, *c.* 27, § 18 ; and 1797, *c.* 74, § 5. The first three of these acts referred to bonds given for payment of duties, and the rights and liabilities of sureties thereon. The provision for giving preference to the United States was somewhat extended by *St.* 1797, *c.* 74, but it is still strictly limited. It provides, § 5, " that where any revenue officer, or other person, hereafter becoming indebted to the United States by bond or otherwise, shall become insolvent, or where the estate of any deceased debtor, in the hands of executors or administrators, shall be insufficient to pay all the debts due from the deceased, the debt of the United States shall be first satisfied ; and the priority hereby established shall be deemed to extend as well to cases in which a debtor not having sufficient property to pay all his debts shall make a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed or absent debtor shall be attached by process of law, as to cases in which an act of legal bankruptcy shall be committed." 1 U. S. Laws, (Story's ed.) 465.

We are of opinion, that by a fair construction of these provisions, they do not extend to banks and other corporations. This opinion is not founded on the distinction, that corporations, in general, will not be included in legal enactments, extending generally to persons. We think the general rule is otherwise. *U. States* v. *Amedy,* 11 Wheat. 392. But it must depend upon the terms and subject matter of the enactment.

13 *

The question is, whether the provision contained in the U. S. *St. c.* 74, § 5, giving to the United States a priority in certain cases, extends to the case of an incorporated bank, called before a court of equity, under certain statute provisions, and of whose property and effects receivers have been appointed.

It has been so often held, in the courts of the United States and elsewhere, from the case of *Bartlet* v. *Prince*, 9 Mass. 451, and 8 Cranch, 431, that the insolvency contemplated in this act must be something more than a mere inability on the part of a debtor to pay all his debts, and must be some state of insolvency by a general, voluntary assignment, or by legal proceeding, that it is now unnecessary to multiply authorities to the point.

But the statute itself designates the kind or species of insolvency, and of voluntary or legal proceeding which must exist, in order to give to the United States the priority claimed for their debts. That of the death of the debtor, the most common and frequent case of any, can apply only to individual debtors, and cannot apply to corporations. This, therefore, may be laid out of the case. The statute then proceeds to declare, that the priority thereby established shall be deemed to extend as well to cases in which a debtor not having sufficient property to pay all his debts shall make a voluntary assignment thereof, or in which the effects of an absconding or absent debtor shall be attached by process of law, as to cases in which an act of legal bankruptcy shall be committed.

This language is so peculiarly applicable, and indeed in almost every particular so exclusively applicable, to the case of individual debtors, and so inapplicable to banks and other corporations, that we are of opinion, that congress, in passing this law, had not the case of corporations in their contemplation, and did not include them. They never have been included in the bankrupt laws of the United States, nor, it is believed, in the general insolvent laws of the several States. The case of corporations is so distinguishable from that of

the ordinary settlements of the estate of deceased persons by executors and administrators, and of others by assignees under general assignments and proceedings in bankruptcy, and of all settlements of insolvent estates *inter vivos*, that if the legislature had intended to include corporations, having perpetual existence, created and in all respects governed and regulated by charter or special acts of incorporation, and necessarily managed by directors, agents or officers, whose powers and duties may be extremely various, they would probably have used more special words designating that intent, and providing for the execution of the law giving priority in respect to them. From the absence of all such express words and appropriate provisions, and from the adoption of the terms adapted to the case of individual debtors, the court are of opinion that corporations are not included.

3. But if there were more doubt on either of the foregoing points, the court are all of opinion that here was not such an insolvency as to bring the case within the provisions of the statute giving the United States a priority.

It is established by a series of authorities, that insolvency alone, incapacity to pay all the debts which the debtor owes, is but one circumstance only to bring the case within the statute. It must be insolvency, accompanied with the circumstance that there has been a general assignment by the voluntary act of the debtor, or a legal bankruptcy or insolvency. It is not sufficient that a debtor is incapable of paying his debts, and that the winding up of his affairs is effected, in whole or in part, by legal proceedings. Under the attachment laws of Massachusetts, the whole of a debtor's property might be attached at the suits of various creditors, and be insufficient to satisfy all his debts. It might be sold and converted into money, in a course of legal proceedings, by the sheriff, and the whole of the money, thus in the custody of the law, be paid out to creditors ; and yet the United States can assert no priority. *Bartlet* v. *Prince*, 9 Mass. and 8 Cranch, *ubi sup.* So if a debtor should assign different portions of his property, by different instruments. tc

trustees, for several creditors or classes of creditors, though legal proceedings might be resorted to by creditors to enforce such trusts, yet if it were not a general assignment, nor a legal bankruptcy, it would not let in the claim for priority given to the United States by the statute.　Congress might have made this act so extensive in its operation as to provide that in all cases, where a debtor's property is brought under custody of the law by sequestration, attachment, or compulsory or voluntary assignment, to be distributed amongst creditors, the United States should have priority. But we think the statute in its terms, and the judicial construction which has been uniformly given to it, is not thus extensive, but is limited to the particular cases specified. These cases, we think, are well stated in the case of *Beaston* v. *Farmers' Bank of Delaware,* 12 Pet. 133.　In this case, there was a division of opinion upon the point, whether this act could, in any case, relate to a debtor corporation ; but in the position for which it is now cited, it seems that all the court concurred.　Having cited the 5th section of the *St.* of 1797 at length, the court proceed to state the following points, for which former decisions are cited at some length :
" From the language employed in this section, and the construction given to it, from time to time, by this court, these rules are clearly established :　First. That no lien is created by the statute.　Secondly. The priority established can never attach while the debtor continues the owner, and in the possession of the property, although he may be unable to pay all his debts.　Thirdly. No evidence can be received of the insolvency of the debtor, until he has been divested of his property in one of the modes stated in the section.　And fourthly, whenever he is thus divested of his property, the person who becomes invested with the title is thereby made a trustee for the United States, and is bound to pay their debt first, out of the proceeds of the debtor's property."　Taking this to be a just statement of the rules for determining what constitutes a legal bankruptcy or insolvency within the statute, it appears to the court quite clear that the present case is not within it.

These proceedings were instituted under and by virtue of *St.* 1838, *c.* 14, § 5. The act is entitled " an act providing for the appointment of bank commissioners." It provides for the examination of all banks and savings institutions, under various regulations, all designed to ascertain whether, at any time, these moneyed institutions, in which the public have so deep an interest, are in a safe and healthy condition, and to take suitable precautions in case of danger. Sect. 5 provides, that " if upon examination of any bank or provident institution for savings, a majority of said commissioners shall be of opinion that the same is insolvent, or that its condition is such as to render its further progress hazardous to the public, or to those having funds in its custody, and also that the said bank or provident institution for savings has exceeded its powers, or has failed to comply with all of the rules, restrictions and conditions provided by law, they may apply to some one of the justices of the supreme judicial court to issue an injunction to restrain such corporation, in *whole* or in *part*, from further proceeding with its business, until a hearing of the said corporation can be had ; " after which, such justice " may dissolve or modify the said injunction or make the same perpetual, and make such orders and decrees to suspend, restrain or prohibit the further prosecuting of the business of such corporation, as may be needful in the premises, according to the course of chancery proceedings, and at his discretion, may appoint agents or receivers to take possession of the property and effects of the corporation, subject to such rules and orders as may from time to time be prescribed by the supreme judicial court, or any justice thereof in vacation."

It has sometimes been said, that this was a law providing a mode by which banks can be placed in a state of legal insolvency, or, in other words, an insolvent law for banks. This seems to arise from too hasty a conclusion that, because things are alike in many respects, they are alike in all. The most that can be said of the act in this respect is, that it is like an insolvent law for banks, because it may so operate as to put an end to the further operation of a bank, in case of insolvency,

distribute the whole of its funds amongst creditors and stock-holders, and thus operate like a bankrupt law or insolvent law. Looking at the facts which are known to us, from the many former proceedings in the case of the Phœnix Bank, we may feel quite safe in anticipating that this bank will be unable to pay all its debts. Indeed, the whole question would be immaterial, and the discussion idle, if it were otherwise than that, in the end, the bank will be left without capital, without credit, and unable to proceed. But it does not necessarily, and will not, perhaps, generally have this operation; and it differs from an insolvent law in this, that the object of the act is not to declare the bank insolvent, or to effect any transfer or assignment of its property. It provides for a chancery proceeding, by which a competent judicial tribunal is authorized to regulate the proceedings of a bank by an injunction, temporary or permanent, absolute or qualified, affecting all their proceedings, or some particular proceeding only, according to the exigencies and peculiarities of each particular case. And so, in fact, has the law been construed and acted upon by this court. Sometimes an injunction has been limited to a particular operation; such, for instance, as paying any bills or deposits, whilst it is uncertain whether they have ability to pay the whole; because that would prevent an equality of distribution amongst those equally entitled. Sometimes banks have been prohibited from doing any other business except that of securing payment of bills and notes becoming due; and such exception has been made, because a general prohibition might be injurious to those interested, by discharging indorsers and other sureties. Sometimes the transaction of the business has been left in the hands of directors, under such modified or temporary injunction as the court have thought necessary. Sometimes receivers have been appointed to take possession of the effects. The power vested in the court has been exercised with a view to accomplish the object contemplated by the statute, according to the exigencies of each particular case, without regard to the consideration whether it would lead to the final termination of the

affairs of the bank or not. Even when receivers are appointed, they are to be appointed *as receivers,* in a proceeding directed to be conducted "according to the course of chancery proceedings." They are officers of the law, subject in all respects to the orders and directions of the court. The law requires no assignment to be made to them, either by the bank or by any authorized court or officer. In practice, none is usually made, and none has been made in this case. They are to take possession of the property and effects of the corporation, subject to the rules and orders of the court. Their power to sell and convert the property into money is not given them by statute, or by any assignment or transfer, but it depends wholly on the order of the court. The distribution of the proceeds amongst bill holders and other creditors, and the residue, if any, to stockholders — a feature so essential to every system of bankrupt or insolvent law — is not provided by this statute, but results only from the orders and decrees of the court, regulated by those principles of equity which govern all courts in the disposition of funds directed to be administered according to the course of chancery proceedings. Although, therefore, the proceedings under this law, in their ultimate results, and in some states of facts, operate like an insolvent law for this class of corporations, this is not the declared nor obvious purpose, nor the necessary consequence of the law. And further ; it is wanting in the most essential feature of an insolvent law, that of divesting the debtor of the property, and vesting it in some other persons, and constituting the proceeds a trust fund for creditors, in which it is held that the United States, as *cestui que trust,* have a priority for the payment of their whole debt. It is therefore not a case of legal bankruptcy or insolvency ; for we believe these terms, as used in this sense, are synonymous, within the construction of the United States *St.* of 1797, *c.* 74.

In the case of *Beaston* v. *Farmers' Bank of Delaware,* 12 Pet. 102, in that part of the opinion which received the sanction of the whole court, it was decided, that where a bank had stopped payment and ceased all operations, and

receivers had been appointed, it did not constitute such insol-vency as to give the United States a priority. It was left doubtful, upon the facts of that case, whether the receivers had acted under the power conferred upon them by the appointment. But the judgment of the court was, that if they had, it would not have been a transfer and possession of the property of the Elkton Bank, within the meaning of the act of congress, and therefore the priority could not have attached to the funds in their hands.

On the whole, the court are of opinion, and do adjudge and decree, that the United States are not entitled to receive the full amount of the sums deposited in the Phœnix Bank, by the several pursers and the recruiting officer, out of the funds of that bank in the hands of the receivers, but that the said officers are entitled to dividends *pari passu,* with other cred-itors who had deposits in the Phœnix Bank at the time of its suspension of payments.